## APPEAL OF MEYER JEWELRY CO.

Docket No. 3143.  Submitted January 26, 1926.  Decided April 20, 1926.

Cancellation of indebtedness by agreement of creditors, under circumstances set forth, *held* not to constitute income.

*Fred J. Wolfson, Esq.*, and *L. U. Crawford, C. P. A.*, for the taxpayer.

*Briggs G. Simpich, Esq.*, for the Commissioner.

Before STERNHAGEN and ARUNDELL.

This is an appeal from the determination of a deficiency in income and profits taxes for the fiscal year ended January 31, 1922, in the sum of $7,130.36. The deficiency arises from the inclusion in gross income of $44,023.37, representing the amount of indebtedness forgiven the taxpayer by certain of its creditors, and by the inclusion in income of $3,254.38, designated on the books of the taxpayer as a reserve for bad debts.

### FINDINGS OF FACT.

The taxpayer was organized under the laws of Missouri in 1890, with a capital stock of $2,000, and has' been at all times engaged in the jewelry business in Kansas City. Louis Meyer owned most of the stock of the taxpayer and was its president and directing head.

The affairs of the taxpayer became so involved that on or about March 1, 1921, a meeting of the creditors was had in New York with Meyer and his attorney for the purpose of reaching some adjustment of the claims against the company. The creditors, after making an investigation, determined that 60 per cent of their claims was all they could expect to realize, either by composition or by forced liquidation. The creditors, desiring that the company should be given a chance to continue in business, agreed to accept 60 per cent of their claims, payment to be made in six installments, each amounting to 10 per cent of their respective claims and maturing at intervals until July 2, 1922. The first payment was to be made in

cash in April, 1921, and the remaining payments were to be evidenced by notes of the company. The taxpayer, during 1921 and 1922, paid the full 60 per cent agreed upon and was fully discharged from the indebtedness so compounded. The claims of the creditors were reduced by the amount of $44,023.37, which amount was treated on the books of the taxpayer as a contingent liability until January 31, 1924, when, after certain minor adjustments, it was transferred to the surplus account of the company.

The books of the taxpayer disclose that its book surplus was, at the close of the fiscal years 1917 to 1924, as follows:

| | |
|---|---|
| Jan. 31, 1917 | $66, 514. 97 |
| Jan. 31, 1918 | 72, 292. 46 |
| Jan. 31, 1919 | 72, 182. 18 |
| Jan. 31, 1920 | 74, 783. 58 |
| Jan. 31, 1921 | 55, 385. 29 |
| Jan. 31, 1922 | 31, 032. 11 |
| Jan. 31, 1923 (before transfer of contingent liability) | 8, 984. 79 |
| Jan. 31, 1924 (after adjustment and transfer to surplus of the amount forgiven) | 52, 817. 03 |

The taxpayer maintained two control accounts in its general ledger, known as " City accounts receivable " and " Country accounts receivable." Some time after the close of the fiscal year 1921, the taxpayer's accounts were audited as of January 31, 1921, by an accountant, who reported that discrepancies existed between the two control accounts and the subsidiary accounts receivable ledgers. His audit disclosed that the subsidiary ledger for city accounts receivable showed outstanding accounts which, in the aggregate, were less than the balance in the control account by the amount of $2,094.59, and that the subsidiary ledger for country accounts receivable showed outstanding accounts which, in the aggregate, exceeded the balance in the control account by the amount of $3,385.89, a net difference of $1,291.30. Instead of making entries in the control accounts, so as to bring them into balance with the subsidiary ledgers, taxpayer opened in its general ledger an adjustment account to which the net difference of $1,291.30 was charged. During the fiscal year 1922, debit and credit entries were made to this adjustment account. After the close of the fiscal year 1922, the accounts were again audited, as of January 31, 1922, by the same accountant. This latter audit disclosed that the subsidiary ledger for city accounts receivable showed outstanding accounts which, in the aggregate, were less than the balance in the control account by the amount of $1,019.80, and that the subsidiary ledger for country accounts receivable showed outstanding accounts which, in the aggregate, were greater than the balance in the control account by the amount of $4,274.18, a net difference of $3,254.38. Following this audit a journal entry was made

charging country accounts receivable control account with the amount of $4,274.18 and crediting city accounts receivable control account and reserve for bad debts with the amounts of $1,019.80 and $3,254.38, respectively. The Commissioner increased the net income as reported by the taxpayer for the fiscal year 1922 by the amount credited to the bad debt reserve, to wit, $3,254.38.

## OPINION.

ARUNDELL: If the cancellation of an indebtedness under the circumstances in this case may be called income by the common understanding of the word, it is believed that section 213 of the Revenue Act of 1921 is sufficiently broad to make the amount thereof taxable. Congress intended to exercise its power to the full·extent granted by the Constitution. *Eisner* v. *Macomber*, 252 U. S. 189, 206; *Irwin* v. *Gavit*, 268 U. S. 161. The Supreme Court, in the case of *Stratton's Independence* v. *Howbert*, 231 U. S. 399, a case arising under the Corporation Excise Tax Act of 1909, first defined income as the " gain derived from capital, from labor, or from both combined." This definition, as explained in *Eisner* v. *Macomber*, *supra*, has been uniformly followed. In that case Mr. Justice Pitney laid down the fundamentals to be considered in determining what is income, within the meaning of the law and the Constitution, in such clear language that it has served as a guide in all future cases. The court said:

After examining dictionaries in common use (Bouv. L. D.; Standard Dict.; Webster's Internat. Dict.; Century Dict.), we find little to add to the succinct definition adopted in two cases arising under the Corporation Tax Act of 1909 (*Stratton's Independence* v. *Howbert*, 231 U. S. 399, 415; *Doyle* v. *Mitchell Bros. Co.*, 247 U. S. 179, 185)—" Income may be defined as the gain derived from capital, from labor, or from both combined," provided it be understood to include profit gained through a sale or conversion of capital assets, to which it was applied in the *Doyle Case* (pp. 183, 185).

Brief as it is, it indicates the characteristic and distinguishing attribute of income essential for a correct solution of the present controversy. The Government, although basing its argument upon the definition as quoted, placed chief emphasis upon the word " gain," which was extended to include a variety of meanings; while the significance of the next three words was either overlooked or misconceived. " *Derived—from—capital;*"—" the *gain— derived—from—capital*," etc. Here we have the essential matter: *not* a gain *accruing to* capital, not a *growth* or *increment* of value *in* the investment; but a gain, a profit, something of exchangeable value *proceeding from* the property, *severed from* the capital however invested or employed, and *coming in*, being " *derived*", that is, *received* or *drawn by* the recipient (the taxpayer) for his *separate* use, benefit and disposal;—*that* is income derived from property. Nothing else answers the description.

The same fundamental conception is clearly set forth in the Sixteenth Amendment—" incomes, *from* whatever *source derived* "—the essential thought being expressed with a conciseness and lucidity entirely in harmony with the form and style of the Constitution.

In the case of the *Merchants' Loan & Trust Co.* v. *Smietanka*, 255 U. S. 509, the court, in commenting upon the definition of income as heretofore laid down, stated:

There would seem to be no room to doubt that the word [income] must be given the same meaning in all of the Income Tax Acts of Congress that was given to it in the Corporation Excise Tax Act and that what that meaning is has now become definitely settled by decisions of this court.

In determining the definition of the word " income " thus arrived at, this court has consistently refused to enter into the refinements of lexicographers or economists and has approved, in the definitions quoted, what it believed to be the commonly understood meaning of the term which must have been in the minds of the people when they adopted the Sixteenth Amendment to the Constitution.

In the case of *Kerbaugh-Empire Co.* v. *Bowers*, 300 Fed. 938, the taxpayer, a borrower of German marks, repaid the debt eight years later when marks had fallen in value. The Commissioner taxed as income the difference in value. The court, in a well-considered opinion, held that the saving was not taxable as income since it was not derived from the employment of capital, or labor, or both combined, or from a sale or conversion of capital assets resulting in a profit, and that " under the Constitution and the Revenue Act of 1921 there can be no such thing as a negative income; the two words being inconsistent." The court, in reaching its conclusion, stated:

In the case at bar, there was no sale of capital assets, nor was there any such conversion of capital assets, as existed in the *Phellis Case*. On the government's theory, all that the plaintiff could have had is an accretion of assets. As a matter of fact there was not even an increase of assets. There was a decrease of assets through the payment of a part of plaintiff's assets in settling the indebtedness. The fact that after the transaction the plaintiff's balance sheet had improved was not sufficient to constitute " a gain derived from capital." If anything, it was a gain accruing to capital, and, as such, under the *Eisner* and *Phellis Cases*, was not taxable income.

Now to apply the tests as laid down by the courts to facts in the instant appeal. The evidence is clear that it was not compensation for services; it can not be considered as income from a business entered into for profit, and there is no element to identify it as a gain which was derived from capital, or from labor, or from a combination of both. It is true the taxpayer has been relieved from paying an amount to its creditors by their common consent, an amount which the evidence shows it could not have in fact paid whether voluntarily relieved of payment or not. Its balance sheet will disclose a more favorable financial condition, but " enrichment through increase in value of capital investment is not income in any proper meaning of the term." *Eisner* v. *Macomber, supra*. That the taxpayer received a benefit in the sense of being able to continue its business may be conceded, but such an opportunity can not

constitute a gain or income, within the meaning of the Constitution and the Revenue Acts. It is not believed that relief from paying an obligation, under the circumstances set forth in this case, constitutes income, and it is our opinion that it is not taxable under the statute.

It does not follow from what has been said that there may not be circumstances constituting the remission of an indebtedness income, nor are we called upon to pass upon the question whether the cancellation of the indebtedness may have served to reduce the cost price of the goods purchased by the taxpayer, thereby serving to furnish a new basis for the determination of gain or loss on their subsequent disposition. We are convinced, however, under the circumstances of this appeal, that the cancellation of the taxpayer's indebtedness does not constitute income.

From the findings of fact it is evident that the Commissioner erred in including in income the entire sum of $3,254.38, the amount of an item designated on the books as a reserve for bad debts. An audit of the books at the close of the fiscal year January 31, 1921, disclosed a net difference between the control and subsidiary ledgers of $1,291.30. No adjustment to bring these ledgers into balance was made at that time. A further audit of these books at the close of the fiscal year January 31, 1922, disclosed the fact that the difference between the control and subsidiary ledgers amounted to $3,254.38. Obviously, only the difference between $3,254.38 and $1,291.30 constituted income for the fiscal year ended January 31, 1922.

*Order of redetermination will be entered on 15 days' notice, under Rule 50.*

STERNHAGEN dissents.

On reference to the Board, JAMES and GRAUPNER dissent. PHILLIPS and TRUSSELL concur in the result only.