COLONIAL SAVINGS ASSOCIATION AND SUBSIDIARIES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 25477–82.     Filed November 26, 1985.

*Robert A. Schnur*, for the petitioners.
*Mark D. Petersen*, for the respondent.

GERBER, *Judge*: Respondent determined a deficiency of $5,000 in petitioners' taxable year ended June 30, 1980. Due to an agreement of the parties,[1] the sole issue for our consideration is whether income received by financial institutions as penalties for premature withdrawal is to be treated as income from discharge of indebtedness within the meaning of section 108.[2] This is an issue of first impression.

## FINDINGS OF FACT

All of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated by this reference. The factual pattern in this case is essentially the same as that presented in Rev. Rul. 83-60, 1983-1 C.B. 39, and respondent contends that the rationale of that ruling is dispositive of the issue before us.[3] We are, of

---

[1] Respondent determined several adjustments to the amounts reported by petitioners. For purposes of this opinion, however, the only issue for our consideration deals with cancellation of indebtedness. With respect to another pending issue, the parties in this case have agreed to be bound by the final decision in *Frontier Savings & Loan Association v. Commissioner*, docket No. 24559-83 (including any appeal thereof). Because of concessions by petitioners, a Rule 155 computation, Tax Court Rules of Practice and Procedure, will be necessary if respondent does not prevail in either of the remaining issues.

[2] All statutory references are to the Internal Revenue Code of 1954 as amended and in effect for the taxable year at issue.

[3] In pertinent part, the facts of Rev. Rul. 83-60, 1983-1 C.B. 39, are as follows:

FACTS

The taxpayer is a financial institution that issues savings certificates with terms of maturity varying from 6 months to 10 years. Federal regulations pertaining to these certificates require a holder to forfeit an amount as a penalty for withdrawal of the funds before the stated term of maturity. The amount of this premature withdrawal penalty is prescribed by the Depository Institutions Deregulation Committee (DIDC), which was established by the Depository Institutions

course, aware that a revenue ruling merely represents the position of one of the litigants in this case, the Commissioner of Internal Revenue.

Colonial Savings Association (petitioner), a Wisconsin savings and loan associations organized on August 26, 1892, was owned by approximately 17,000 depositors as of June 30, 1980. Petitioner has two wholly owned subsidiaries: Brown County Service Corp., incorporated in 1975, and Colonial Financial Services, Inc., incorporated in 1976. References to petitioner in the singular will be to Colonial Savings Association. Petitioner's principal corporate office is in Green Bay, Wisconsin. Branch savings and loan offices are also maintained at several locations in Green Bay and Appleton, Wisconsin.

Petitioner, a cash basis taxpayer, timely filed a consolidated corporate income tax return (Form 1120) with the Internal Revenue Service Center, Kansas City, Missouri, for its taxable year ended June 30, 1980.

When a depositor opened an account, petitioner provided the depositor with a certificate describing the account. If the depositor renewed the account, a new certificate was not issued, but petitioner sent a notice informing the depositor of any changes in the terms of the account. The parties have agreed that the certificates and notices of changes included terms that complied with all laws and regulations applicable to savings accounts at the time of issuance.

Petitioner's accounts included certificates with terms ranging from 3 months to 8 years.[4] Interest was compounded on

---

Deregulation Act of 1980, section 203, 12 U.S.C. section 3502 (1980). * * *

\* \* \* \* \* \* \*

The regulation provides a premature withdrawal penalty that may cause, in effect, a forfeiture of principal, as well as interest. If the deposited funds are withdrawn before the specified amount of interest is earned, or before it could have been earned, then a portion of the principal must be forfeited to pay the prescribed penalty.

Under the taxpayer's contracts with its savings certificate holders, interest at a fixed rate is paid or credited to accounts of the holder either monthly or quarterly at the holder's option. The interest is withdrawable on demand and without penalty. The taxpayer's contracts also contain the terms of the penalties required by the above DIDC regulation for premature withdrawal. Should a holder incur a premature withdrawal penalty after withdrawing interest earned, a corresponding reduction is made in principal returned to the holder.

The taxpayer reported on its federal income tax return its income attributable to premature withdrawal penalties as income from the discharge of indebtedness under section 108 of the Code. Thus, the taxpayer excluded the amount of the penalties from its gross income and elected to reduce under section 1017 the basis of its depreciable property by the amount excluded.

[4]Petitioner had the following types of accounts based on their maturities: 3-month, 6-month, 1-year, 2-year, 2½-year, 3-year, 4-year, 6-year, and 8-year certificates.

these accounts on a daily basis with petitioner adding, on its computer records, the daily interest each day to the depositor's account.[5] With respect to petitioner's 6-month certificates, petitioner computed and added the interest to a depositor's account on a daily basis in the same manner as the other accounts, except that the interest was not compounded.

Some of the depositors' accounts were opened during petitioner's taxable year ended June 30, 1980. The remainder of the accounts were opened in prior years, and either the initial term had extended into or through petitioner's 1980 taxable year, or the initial term had expired on prior years, but the depositor had renewed the account at least once for a term extending into or through petitioner's 1980 taxable year. Petitioner's total deposits were $106,383,872 at the beginning of its 1980 taxable year, and $123,617,503 on June 30, 1980, at the end of its taxable year.

On any given day, a depositor could withdraw the principal balance in his account, plus the interest shown on petitioner's computer records as earned through such date, less any accrued interest that the depositor had already withdrawn. If a depositor requested the withdrawal of the principal in any account prior to maturity, the depositor was required, both pursuant to the terms of the certificates and Federal regulation,[6] to forfeit an amount as a penalty for withdrawal of the funds before the certificates reached maturity.[7] When a penalty for premature withdrawal was incurred, the depositor

---

[5]The amount of daily interest was computed by applying the applicable annual interest rate to the amount on deposit (including previously compounded interest) and then dividing the result by 360.

[6]The amount of the premature withdrawal penalty has been prescribed by the Depository Institutions Deregulation Committee (DIDC) since July 31, 1980. Prior to that time, the Federal Home Loan Bank promulgated the regulations. For accounts opened or renewed after June 30, 1979, and before June 2, 1980, the regulations required the depositor to forfeit 3 months' interest on accounts with terms of 1 year or less and required the depositor to forfeit 6 months' interest for accounts with terms exceeding 1 year. If the account was open for less than the 3-month or 6-month minimum penalty period, whichever was applicable, the depositor was required to forfeit all the interest. 12 C.F.R. sec. 526.7(a) (1979).

For accounts opened or renewed after June 1, 1980, the depositor was required to forfeit all the interest which could have been earned, whether earned or not, for accounts with terms of less than 3 months. For accounts with terms from 3 months to 1 year, the depositor was required to forfeit 3 months' interest, whether earned or not. And for accounts with terms of more than 1 year, the depositor was required to forfeit 6 months' interest, whether earned or not. 12 C.F.R. sec. 1204.103 (1981).

[7]The penalty for premature withdrawal may cause a forfeiture of principal as well as interest. Classification of whether interest or principal is being forfeited does not change the outcome of this case.

received a netted amount, composed of the principal on deposit plus interest payable to the date of withdrawal, less the penalty for premature withdrawal. The mandatory forfeitures were therefore "paid" by reducing the amounts payable to the depositor by the amount that the depositor had agree to pay and was required to forfeit. In no event did a depositor "pay" the forfeiture after first receiving the full amount due on a certificate.

Petitioner's books, for the period beginning July 1 to September 4, 1979, reflected the deduction of a net amount under section 591, comprised of gross interest accrued, less the amount of premature withdrawal forfeitures. Thus, petitioner treated the forfeitures during that period (in the amount of $8,024.04) as a reduction of its total interest deduction for that period. For the period beginning September 4, 1979, petitioner deducted the total amount of each day's interest as and when such interest was shown on petitioner's computer records. Petitioner treated the premature withdrawal forfeitures during this period as income from the discharge of indebtedness under section 61(a)(12) and excluded that amount from its gross income under section 108. Petitioner timely elected to treat the amount so excluded as a reduction in petitioner's basis of property under section 1017.

The total amount petitioner deducted during the taxable year ended June 30, 1980, after the offsets for early withdrawal forfeitures described above, was $10,372,635.95. The total amount forfeited by depositors due to early withdrawals from accounts on deposit was $600,744.88.

Petitioner contends that its method of handling the forfeitures prior to September 4, 1979, was incorrect. Petitioner believes that such method was incorrect because the forfeitures should always have been treated as income from the discharge of indebtedness.[8]

OPINION

It is well settled that gross income means gross income from whatever source derived. Sec. 61(a). Gross income includes

---

[8]Petitioner does concede, however, that it made certain errors in calculating the amount to be excluded and that, if the early withdrawal forfeitures do constitute income from discharge of indebtedness, the amount that should be excluded under sec. 108 is $591,896.36.

income from discharge of indebtedness. Sec. 61(a)(12). A taxpayer may realize income by paying an obligation at less than its face value. *United States v. Kirby Lumber Co.*, 284 U.S. 1, 3 (1931), revg. 71 Ct. Cl. 290, 44 F.2d 885 (1930); sec. 1.61–12(a), Income Tax Regs. For transactions occurring on or before December 31, 1980, however, no amount is included in gross income by reason of the discharge of any indebtedness for which a corporate taxpayer is liable if the taxpayer files a consent to the regulations prescribed under section 1017 relating to the adjustment of basis of property. Sec. 108.[9]

This is the first instance where a court has been asked to determine whether the receipt of premature withdrawal penalties is income from discharge of indebtedness within the meaning of sections 108 and 1017. Petitioner asserts that, but for section 108(a), these forfeited amounts would be includable in petitioner's gross income under section 61(a)(12). Respondent, on the other hand, asserts that not every indebtedness that is canceled results in gross income being realized "by reason of" cancellation of indebtedness. Rather, respondent argues that section 108 does not apply if the cancellation is simply the "medium" for payment. Respondent reasons that the penalty is a form of agreed upon or liquidated damages which the depositor has agreed to pay for the right to withdraw the funds at any time and to compensate the financial institution for lost profits, and thus the amount the depositor forfeits is simply the "medium" to pay this debt.

In addition, respondent argues that, pursuant to the contractual agreement between petitioner and depositors, petitioner was to be compensated if the funds were demanded early. The value of giving up the right to use the funds until maturity presumably equals the amount of the penalty and there was no cancellation of indebtedness because the financial institu-

---

[9]The Bankruptcy Tax Act of 1980, Pub. L. 96–589, sec. 2(a), 94 Stat. 3389, amended sec. 108. For transactions occurring after Dec. 31, 1980, sec. 108(a) and (d)(4) provides that gross income does not include any amount which would be includable in gross income by reason of the discharge of indebtedness of the taxpayer if the indebtedness discharged is indebtedness incurred or assumed by a corporation or an individual in his trade or business that makes an election under sec. 108(d)(4) with respect to the indebtedness.

Sec. 108 normally results only in postponement, rather than forgiveness, of taxable income by reducing the basis of depreciable assets under sec. 1017 and thereby assuring that the excluded income would reduce deductions from ordinary income in future years. Because the 1980 amendment applies in general only to transactions occurring after Dec. 31, 1980, the 1980 amendment does not apply to this case.

tion received value equal in amount to the withdrawal penalty thus satisfying the debt in full. Petitioner counters that there was no payment and therefore there should not be any two-step analysis as respondent asserts. The statutes (sections 61(a)(12) and 108) are stark and undetailed. They cryptically provide that income from discharge of indebtedness is includable in gross income unless the taxpayer files a consent to defer the income pursuant to section 1017. These statutes, until 1980 revisions, have existed for over four decades without a definition of indebtedness or its cancellation. The gist of this case is whether the indebtedness (principal or interest) owed to the depositor has been "canceled" by means of the parties' agreement to reduce the indebtedness by the amount of a penalty for premature withdrawal of the indebtedness. More specifically, is this penalty a forgiveness, discharge, or cancellation within the meaning of sections 61(a)(12) and 108 and underlying case precedents? We hold that the forfeiture in this case is not a discharge of indebtedness within the meaning of the statutes and *United States v. Kirby Lumber Co.*, *supra*, and its progeny. As more fully discussed in the foregoing opinion, we find that the forfeiture was a separate and distinct obligation required of depositors for early withdrawal and not a forgiveness or discharge of the debt. The debt to the depositor was not canceled or discharged, it was simply reduced.

Prior to 1931, the Government was singularly unsuccessful in promoting the concept that income could be realized due to the discharge of indebtedness.[10] *Meyer Jewelry Co. v. Commissioner*, 3 B.T.A. 1319 (1926); *American Tobacco Co. v. Commissioner*, 20 B.T.A. 586, 588 (1930) (and cases cited therein). These cases focused upon the constitutional definition of income and the holdings of *Eisner v. Macomber*, 252 U.S. 189 (1920), and *Bowers v. Kerbaugh-Empire Co.*, 271 U.S. 170 (1926).

In 1931, however, the Government's position that income could be realized due to discharge of indebtedness met with

---

[10]In attempting to develop a historical perspective of this area of the tax law, we were confronted by a confusing line of precedent. A noted commentator has also called it "One of the murkiest pools of obscurity in the tax law * * *" and suggested that "logic has taken an extended vacation in the debt cancellation area." Eustice, "Cancellation of Indebtedness and the Federal Income Tax: A Problem of Creeping Confusion," 14 Tax L. Rev. 225, 286 (1959). Interestingly, that comment, although more than a quarter of a century old, is still true.

success in *United States v. Kirby Lumber Co., supra.* The *Kirby* holding essentially rationalized that a reduction in debt (liabilities) without a corresponding reduction of assets causes income by unencumbering the assets and providing an economic gain or realizable event.[11]

The Government has managed to protect its *Kirby* win over the past 55 years with certain exceptions.[12] In situations where the cancellation of a debt was a gift or gratuitous act, courts have held that income from discharge of indebtedness did not occur. *Helvering v. American Dental Co.,* 318 U.S. 322 (1943); *Edmont Hotel Co. v. Commissioner,* 10 T.C. 260 (1948). But see *Commissioner v. Jacobson),* 336 U.S. 28 (1948). In a similar vein, courts have held that debt forgiveness by a shareholder-creditor is a contribution to capital, rather than income to the corporation due to the forgiveness of indebtedness. *Commissioner v. Fender Sales, Inc.,* 338 F.2d 924, 930 (9th Cir. 1964), cert. denied 382 U.S. 813 (1965). In *Putoma Corp. v. Commissioner,* 66 T.C. 652, 663–672 (1976), affd. 601 F.2d 734 (5th Cir. 1979), we analyzed the precedential relationship between the tax benefit rule, the *Kirby* holding, and the contributions to capital exception.

Another line of cases provides an exception to *Kirby* where there is essentially no indebtedness or the debt is contingent. An example of this exception involves a situation where a taxpayer satisfied an outstanding real property lien with municipal bonds purchased at a discount. *Hotel Astoria, Inc. v. Commissioner,* 42 B.T.A. 759 (1940). Because the Hotel Astoria was not "personally" responsible for the lien which attached to acquired real property, the Board reasoned that the hotel's use of discounted bonds "simply represented an additional investment * * * in the hotel property." (42 B.T.A. at 764.) Another example may be found in *N. Sobel, Inc. v. Commissioner,* 40

---

[11]*Bowers v. Kerbaugh-Empire Co.,* 271 U.S. 170 (1926), which was founded on the major premise that debt cancellation did not, in the constitutional sense, generate income was overruled or modified by *United States v. Kirby Lumber Co.,* 284 U.S. 1 (1931), revg. 71 Ct. Cl. 290, 44 F.2d 885 (1930). With respect to borrowing and repayment in the same foreign currency, the vitality of its holding is said to have been lost. *National-Standard Co. v. Commissioner,* 80 T.C. 551, 568 (1983) (Tannenwald, J., dissenting), affd. 749 F.2d 369 (6th Cir. 1984). To the extent that the overall effect of the transaction produces a loss to the debtor, *Kerbaugh-Empire* retains some vitality. See *Vukasovich, Inc. v. Commissioner,* T.C. Memo. 1984–611, on appeal (9th Cir., Apr. 30, 1985).

[12]A relatively recent law review article provides a categorization and analysis of the exceptions to the *Kirby* holding. Powell, "A Review of Judicial Exceptions to the Kirby Rule," 30 Fla. L. Rev. 94 (1977).

B.T.A. 1263 (1939), where the Board found the taxpayer's "liability" to be so indefinite and unfixed that it could not be canceled or otherwise reduced. (40 B.T.A. at 1265.) These exceptions tell us that there must be a liquidated debt and it must be the taxpayer's personal obligation in order for *Kirby* to apply.

Another exception to *Kirby* is where the evidence of indebtedness is merely reissued or modified and the underlying debt remains. *Tower Building Corp. v. Commissioner*, 6 T.C. 125 (1946). Here the debt had not been canceled, merely the evidence of it changed. The result might have been different if the par value of the new instrument or evidence of indebtedness was greater or less than that of the old.

Where the value of the asset falls below the balance of the debt it secures and the parties agree upon a reduction in the debt, another exception to *Kirby* has been carved. This exception seems to align with the *Kirby* rationale in that the reduction of the debt would release assets for the debtor's use. *Gehring Publishing Co. v. Commissioner*, 1 T.C. 345 (1942). Likewise, where the asset is voluntarily or involuntarily transferred to the holder of the secured indebtedness, the transaction is treated as a sale or exchange. *Electro-Chemical Engraving Co. v. Commissioner*, 311 U.S. 513 (1941); *Millar v. Commissioner*, 67 T.C. 656, 660 (1977), affd. 577 F.2d 212 (3d Cir. 1978).

It is helpful to understand the legislative background that preceded congressional enactment of sections 108 and 1017. Initially, following the Supreme Court's 1931 opinion in *Kirby*, relief was provided for bankrupt debtors in the form of a basis reduction. Bankruptcy Act of 1898, as amended by the Act of June 22, 1938 (Pub. L. 696, 52 Stat. 840), secs. 268 and 270. This type of relief was extended to insolvent debtors ("in an unsound financial condition") by section 215(a) of the Revenue Act of 1939. Secs. 22(b)(9), 113(b)(3), I.R.C. 1939. In 1942, the "unsound financial conditions" requirement was removed from section 22(b)(9), I.R.C. 1939, because it denied benefits to many meritorious cases.[13] The provisions of sections 22(b)(9) and 113(b)(3), I.R.C. 1939, were reenacted into sections 108 and 1017 without significant change. It appears that the intended

---

[13] S. Rept. 1631, 77th Cong., 2d Sess. (1942), 1942–2 C.B. 504.

relief was to provide deferral of the recognition of realized income which has been "trapped" in assets and which may not be liquid. Initially, such relief was provided for bankrupts and insolvent entities where the recognition would cause acute hardship. In extending this relief to any taxpayer-debtor with income from discharge of indebtedness, Congress did not express an intent to expand the circumstances under which a discharge of indebtedness might occur. *Estate of Delman v. Commissioner*, 73 T.C. 15, 31–40 (1979).

Petitioner contends that the forfeiture, in the form of an "early withdrawal penalty," results in "income by reason of the discharge of indebtedness" under section 108.[14] Petitioner argues that it satisfied a portion of its indebtedness by paying less to its creditor-depositors than the face amount of their debt. Because many of the depositors made the early withdrawal to take advantage of improved interest rates, petitioner sees a parallel to the original congressional purpose to provide relief from "changed economic conditions."[15]

Respondent's position, as set forth in Rev. Rul. 83-60, 1983–1 C.B. 39, and on brief is essentially that the depositors' early withdrawal triggering forfeiture is the "medium" for payment of a penalty which is used to reduce the amount of interest payable to the depositors. Stated another way, the penalty or forfeiture constitutes part of the payment of the interest credited to the depositors' accounts and deducted by petitioner. Respondent's "medium" for payment position has also been referred to as a "spurious" cancellation of indebtedness.[16] "Spurious" cancellation, as defined by its authors, exists when

---

[14]The parties have agreed (1) that petitioner has realized income, (2) that both the principal and interest reflected in depositors' accounts were "legally binding indebtedness," and (3) that petitioner has made a proper election. The sole dispute is whether the penalty or "forfeiture" constitutes discharge (cancellation or forgiveness) of indebtedness.

[15]Petitioner's attempt to bring the facts of this case within the original purposes and requirements for the predecessor of sec. 108 is inapposite. In this instance the creditor, not the debtor, is ostensibly attempting to improve his financial condition (investing his money at higher interest rates) rather then being subjected to unfavorable conditions, i.e., insolvency or reduction in value of assets. Moreover, petitioner does not appear to have an unsound financial condition or other unfavorable conditions. Petitioner had the use of depositors' funds and, by agreement (which was also pursuant to regulation), paid a net amount of interest which was less than originally agreed or no interest at all in some situations. Further, petitioner is permitted under sec. 591 to deduct the entire amount that had been credited to depositors' accounts without being required to make actual payment. At that juncture, petitioner seeks to defer the admitted resultant income by reporting the income as from discharge of indebtedness.

[16]See Bittker & Thompson, "Income From the Discharge of Indebtedness: The Progeny of *United States v. Kirby Lumber Co.*, " 66 Cal. L. Rev. 1159, 1174–1175 (1978).

"careful analysis discloses that the debt was not discharged for less than its face amount but was in fact fully paid." Bittker & Thompson, "Income From the Discharge of Indebtedness: The Progeny of *United States v. Kirby Lumber Co.*," 66 Cal. L. Rev. 1159, 1174 (1978). The above-cited authors employ the following example of a "spurious" cancellation of indebtedness:

if an employer lends $50 to an employee with the understanding that the debt will be deducted from the employee's next paycheck, the debt is paid in full on payday even though no cash changes hands and the transaction is formally termed a "cancellation." The employee must report $50 as income, not because the debt has been cancelled for less than its face amount within the meaning of *Kirby Lumber*, but because he has been paid in full for his services. [Bittker & Thompson, *supra* at 1174.]

Petitioner contends that it had "pure" and not "spurious" cancellation of indebtedness because no consideration passed from petitioner to the depositors for the discharge (forfeiture) as it had from the employee to the employer in the above-cited example. The parties[17] have focused their attention on whether there was one or two transactions between petitioner and each depositor. Ostensibly, the parties must believe that it is necessary to have two separate transactions or events to fall within the "spurious" cancellation area, i.e., indebtedness and separate consideration for its reduction, rather than discharge. Petitioner argues that its relationship with the depositors was solely that of debtor and creditor and the "forfeiture" constituted a discharge of the sole object of the relationship— the debt. Respondent, on the other hand, has ruled[18] that the depositor's liability for the penalty is contractual and also required by DIDC[19] regulations. Respondent's contention is that the forfeiture is "in the nature of agreed-upon fees or liquidated damages intended both as consideration for the early withdrawal privilege, and as compensation to the taxpayer for loss of the use of the deposited funds for the full term of the certificate."

---

[17]By an order dated Nov. 8, 1984, the United States League of Savings Institutions was granted leave to file briefs as amicus curiae. Its briefs have been considered regarding this and other aspects of this case. The briefs of the "League" solely support petitioner's position.

[18]Rev. Rul. 83–60, 1983–1 C.B. 40–41.

[19]DIDC (Depository Institutions Deregulation Committee) was established by the Depository Institutions Deregulation Act of 1980, sec. 203, 12 U.S.C. sec. 3502 (1980).

We agree with both parties that the net effect of or the "forfeiture" itself causes the realization of income to petitioner. We disagree with petitioner, however, that this income is from the discharge of indebtedness. Section 108 only applies to "pure" cancellation of indebtedness income; it does not apply if the debt forgiveness is simply the method by which a creditor makes a payment to a debtor. *OKC Corp. & Subsidiaries v. Commissioner*, 82 T.C. 638, 649 (1984); *Spartan Petroleum Co. v. United States*, 437 F. Supp. 733, 737 (D. S.C. 1977); Bittker & Thompson, *supra* at 1186.

In this case petitioner and each depositor agreed, in substance, as follows: Petitioner agreed to pay interest at a fixed rate and on certain dates if the depositor agreed to deposit an amount of money for a fixed period. The depositor agreed to be subject to a penalty[20] if withdrawals, below a minimum balance requirement, occurred at certain times prior to maturity of the certificate or account. Petitioner, pursuant to section 591, deducted the entire amount of interest accrued in each depositor's account, without reduction for the penalties or forfeitures.[21] This factual pattern does not give rise to cancellation or discharge of the debt. The debt (interest) was credited to the depositor's account and (subsequent to September 4, 1979) deducted in full by petitioner.[22] The depositor was subject to a penalty, depending upon the extent of prematurity of withdrawal, which would either reduce or completely eliminate the interest credited. Further, the depositor may have the principal subjected to the penalty depending upon the prematurity of withdrawal and/or the amount of interest withdrawn from the account. In sum and substance, the debt (which includes both interest and principal)[23] has not been

---

[20]The certificates issued by petitioner contained "Penalty Clause Sections[s]" and the text of these sections referred to a "penalty," whereas the DIDC regulations refer to a "forfeiture." The parties have used the terms "penalty" and "forfeiture" interchangeably in their stipulation of facts and briefs and we have not placed any significance upon the use of these particular terms.

[21]Up until Sept. 4, 1979, and for all prior years, petitioner reduced the gross amount of interest shown in depositors' accounts by the amount of penalties or forfeitures for the same period. Following Sept. 4, 1979, through the conclusion of its taxable year ended June 30, 1980, petitioner did not reduce the gross amount of interest reflected in depositors' accounts by the amount of forfeitures for that same period. This change in approach by petitioner coincides with the change in the regulations, to some extent, as reflected in note 6, *supra*. In any event, petitioner contends that its treatment of the forfeitures prior to Sept. 4, 1979, was in error.

[22]See note 16, *supra*.

[23]The parties agree that both interest and principal in the accounts are the basis for a debtor-creditor relationship between the petitioner and depositors.

discharged, canceled, or forgiven. The penalty or forfeiture was an obligation of the depositor, which petitioner and depositor agreed, in advance, could be satisfied from interest credited or principal deposited in the account.

Respondent has treated consistently the subject of premature withdrawal in regulations and rulings. The obligation to supply depositors with annual information returns, Forms 1096 and 1099–INT, was published in 1973 and required institutions to reflect the full or gross amount of interest credited or paid, unreduced by any penalty or forfeiture for premature withdrawal. Rev. Rul. 73–511, 1973–2 C.B. 402, 403. The rationale of that ruling, in part, relied upon the difference in treatment of the penalty by recipients. In effect, the interest credited was income to the depositor and the penalty deductible as a loss under section 165. If incurred in a trade or business, the loss may be a deduction from gross income, but for some taxpayers the loss may be available only if deductions are itemized. The regulations under section 1017, which were originally filed in 1956, treat payments in kind as discharges affecting basis only to the extent that the value of the payment was less than the reduction of the indebtedness. Sec. 1.1017–1(b)(5), Income Tax Regs.

The need for relief from (deferral of) income from discharge of indebtedness, congressionally considered in the enactment of sections 108 and 1017 and their predecessors, is not present in this case. Here, petitioner's relief would seem to be the penalty for early withdrawal received from the depositor. Petitioner has had the use of depositors' funds, a full tax deduction for interest credited and not necessarily paid,[24] and a penalty to compensate petitioners for any hardship caused by the early withdrawal. In comparison to the *Kirby* principle, there has not been an increase in the value of assets attributable to a reduction in liabilities. In this case, petitioner has been compensated by depositors' payments of penalties. *Estate of Delman v. Commissioner, supra; OKC Corp. & Subsidiaries v. Commissioner, supra; Spartan Petroleum Co. v. United States, supra.*

---

[24]Because a certificate may not mature prior to the end of petitioner's taxable year, petitioner may have enjoyed some deferral without secs. 108 and 1017. The penalty may fall into a subsequent year and not have the tax effect of "washing out" in the same taxable period.

Petitioner cites three cases in support of its position. One of these cases has a factual pattern with some similarities to this case. In *Reliable Incubator & Brooder Co. v. Commissioner*, 6 T.C. 919, 926–927 (1946), the taxpayer was obligated to make $50 monthly payments toward an outstanding and fixed obligation approximating $6,700. At at time when the taxpayer's creditor was in need of money, the parties agreed to reduce the outstanding debt by $1,200 in exchange for a $600 payment by the taxpayer in advance of the monthly due dates. On these facts we decided that there was $600 of income from discharge of indebtedness to the taxpayer, but that the deferral relief was not available because of the taxpayer's failure to file a consent and the taxpayer was not insolvent or in an "unsound financial condition."[25] Although petitioner in this case has filed a timely and proper consent, the facts of this case do not coincide with those in *Reliable Incubator*. Petitioner here was indebted for interest (and principal) and part or all of its indebtedness was "paid" or offset by the depositors' obligation for a penalty attributable to premature withdrawal. Stated another way, the debtor's accumulated interest was essentially used to pay the penalty on a dollar-for-dollar or par basis. The parties in *Reliable Incubator* entered into a "two-for-one" reduction in indebtedness so that each dollar paid provided an additional "dollar of forgiveness" of the debt. Only the additional dollar or credit (the "forgiveness dollar") was found to be income from discharge of indebtedness. *Reliable Incubator & Brooder Co. v. Commissioner*, 6 T.C. 919, 926–927. To the same effect, petitioner has cited a Memorandum Opinion of this Court which followed *Reliable Incubator*. *San Marcos Hotel Co. v. Commissioner*, a Memorandum Opinion of this Court dated April 18, 1852. A third and final case cited by petitioner falls in a similar category with *Reliable Incubator* because it involves a conversion of debt into equity instruments and accrued interest was disregarded at the time of conversion. *Columbia Gas Systems, Inc. v. United States*, 473 F.2d 1244, 1249–1250 (2d Cir. 1973). The issuer of the debt was found to have income from discharge of indebtedness to the extent of interest disregarded at the time of conversion. Again, unlike the facts in the case before us, the disregarding of the

---

[25]The "unsound financial condition" requirement was removed in 1942.

interest at the time of conversion represents a classic application of *Kirby*. Although it could be said that the parties bargained for that result, there is no indication that the bondholder received or was relieved of anything in exchange for the discharged indebtedness.

We understand and do not disapprove of petitioner's attempt herein to arrange its tax matters efficiently and seek deferral of the income from the depositors' penalties. We find, however, that the facts herein do not support the result petitioner seeks.

In view of the foregoing,

*An appropriate order will be entered finding for the respondent on the issue presented in this case*

