T.C. Memo. 1996-543

UNITED STATES TAX COURT

LAYNE E. PRESLAR AND SUE F. PRESLAR, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14051-94.                    Filed December 17, 1996.

<u>Ron Lewis</u>, for petitioners.

<u>Pamelya P. Herndon</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, <u>Judge</u>:  Respondent determined a deficiency in
petitioners' 1989 joint Federal income tax of $123,028 and an
addition to tax under section 6651(a)(1) of $6,151.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for 1989, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions by petitioners, the primary issue for decision is whether petitioners received discharge of indebtedness income upon settlement of their liability on a bank loan.

## FINDINGS OF FACT

Many of the facts have been stipulated and are so found.

At the time the petition was filed, petitioners resided in Cloudcroft, New Mexico. All references to petitioner are to Layne E. Preslar.

In early 1983, petitioner, a real estate agent of 25 years, began negotiations for the purchase of a 2,500-acre ranch near Cloudcroft, New Mexico, known as the McCracken-Rinconada Ranch (the Ranch). Petitioner wanted to develop the Ranch as a sportsmen's resort. Petitioner planned to subdivide and develop 160 acres of the Ranch and to sell 1- to 2-acre lots on which cabins or vacation homes could be built (cabin lots). Each cabin lot would be sold for approximately $16,500, and petitioner projected gross revenue from sales of cabin lots of approximately $1,584,000. The remaining 2,340 acres on the Ranch that were not to be sold as cabin lots would be used for hunting and other outdoor recreation.

After initial contact with owners of the Ranch regarding its possible purchase, petitioner, at the owners' request, conducted all discussions regarding purchase of the Ranch with a representative of First City National Bank of Hobbs, New Mexico (later known and hereinafter referred to as Moncor Bank). Moncor Bank held a perfected security interest in the Ranch as a result of a loan made to the owners of the Ranch. Moncor Bank's security interest, however, was subordinate to those of two other banks which also had made loans to the owners of the Ranch and which had perfected security interests in the Ranch as collateral for their loans. The owners of the Ranch had filed petitions in the U.S. Bankruptcy Court for the District of New Mexico under chapter 11, and Moncor Bank, as a secured creditor, was assisting the owners in selling the Ranch in lieu of foreclosure.

On September 1, 1983, after 6 months of negotiations with representatives of Moncor Bank, petitioners agreed to purchase the Ranch for a stated purchase price of $1 million, to be financed 100 percent by a loan from Moncor Bank (Bank loan). Petitioners executed in favor of Moncor Bank a promissory note with a stated total principal amount of $1 million, nominally payable in 14 annual installments, with interest at 12 percent per annum, and a final payment stated to be due on September 1, 1998.

On September 1, 1983, Moncor Bank paid $760,000 of the stated $1 million loan proceeds to the two other banks which held

security interests in the Ranch.  Moncor Bank did not pay to petitioners, nor to the former owners, the $240,000 balance of the Bank loan.  Rather, the $240,000 balance of the Bank loan was reflected on Moncor Bank's records as a substitution of petitioners' stated debt to Moncor Bank for the debt of the former owners of the Ranch to Moncor Bank.

Moncor Bank agreed to allow petitioners to repay the $1 million stated principal amount of the Bank loan through petitioners' transfer or assignment to Moncor Bank of the written installment contracts entered into by purchasers of the cabin lots.  Upon each cabin lot sale, the written contract for sale of the lot would be assigned and physically transferred by petitioners to Moncor Bank, and petitioners' stated principal debt obligation to Moncor Bank on the Bank loan would be credited with an amount equal to 95 percent of the stated contract price regardless of actual payments received or to be received by Moncor Bank from purchasers of the cabin lots.  Upon each sale of a cabin lot, Moncor Bank received a security interest in each cabin lot in the event the purchaser defaulted on the installment payment obligations agreed to in the purchase of the cabin lot.

Between September 1, 1983, and August 30, 1985, petitioner sold 19 cabin lots and assigned all of the cabin lot sales contracts to Moncor Bank.  Moncor Bank credited 95 percent of the total stated contract price reflected on the cabin lot sales contracts that were assigned to it against the $1 million stated

principal amount of the Bank loan petitioners owed to Moncor Bank. Moncor Bank apparently received a total of $200,537 in installment payments from purchasers of cabin lots.

On August 30, 1985, the U.S. Comptroller of the Currency declared Moncor Bank insolvent, and the Federal Deposit Insurance Corporation (FDIC) became the receiver of Moncor Bank. By letter dated September 2, 1985, the FDIC informed petitioners of Moncor Bank's insolvency and advised petitioners to make payments on the Bank loan to the FDIC as receiver of Moncor Bank.

The FDIC refused to accept any further assignment from petitioners of cabin lot sales contracts as repayment on the Bank loan and ordered petitioners to suspend sales of cabin lots. Petitioners complied with the FDIC's suspension order and did not sell any more cabin lots, but petitioners did not make any subsequent payments on the Bank loan.

In September of 1985, petitioners filed a lawsuit against the FDIC for breach of contract, contesting their liability to the FDIC for the $799,463 principal amount allegedly due on the Bank loan ($1 million less $200,537 in actual payments received by Moncor Bank equals $799,463) and seeking to require the FDIC to accept assignment of cabin lot installment sales contracts as payment on the Bank loan pursuant to petitioners' agreement with Moncor Bank.

On December 19, 1988, petitioners and the FDIC settled their dispute over petitioners' remaining liability on the Bank loan

for $350,000. Petitioners borrowed this $350,000 from First National Bank of Alamogordo in Alamogordo, New Mexico, and paid the $350,000 to the FDIC. As a result of the settlement between petitioners and the FDIC, a total of $550,537 was actually paid on the Bank loan (petitioners' $350,000 settlement payment to the FDIC plus the $200,537 in installment payments received by Moncor Bank equals $550,537).

Petitioners' accountant prepared petitioners' 1989 joint Federal income tax return. With their 1989 tax return, petitioners filed a Form 4868 requesting an automatic extension of time to file their 1989 tax return until August 15, 1990. On August 20, 1990, respondent received petitioners' 1989 joint Federal income tax return and their Form 4868.

On their 1989 tax return, petitioners did not include as discharge of indebtedness income the $449,463 unpaid portion of the stated principal amount of the Bank loan ($1 million stated principal amount of the Bank loan less $550,537 paid on the loan equals $449,463). Instead, petitioners filed with their 1989 tax return a form electing under section 108(e)(5) to reduce their tax basis in the Ranch by $430,000.[1]

On audit, respondent charged petitioners with $449,463 in discharge of indebtedness income relating to the settlement between the FDIC and petitioners of their indebtedness on the

---

[1] The $430,000 represents petitioners' calculation of the basis adjustment to be made under sec. 108(e)(5).

Bank loan, effectively reversing their $430,000 reduction in their tax basis in the Ranch.  Respondent also determined an addition to tax under section 6651(a)(1) for petitioners' failure to timely file their 1989 joint Federal income tax return.

OPINION

Discharge of Indebtedness Income

Taxpayers generally are required to include cancellation or discharge of indebtedness income in income.  Sec. 61(a)(12).  The discharge, however, of a liability that is indefinite or contingent will not trigger discharge of indebtedness income. Colonial Sav. Association v. Commissioner, 85 T.C. 855, 862 (1985), affd. 854 F.2d 1001 (7th Cir. 1988).  Also, where the nature and amount of a liability are contested in a good faith dispute and where a compromise settlement is reached, the excess of the stated principal amount of the alleged debt over the amount for which the liability is settled will not be treated as discharge of indebtedness income.  United States v. Hall, 307 F.2d 238 (10th Cir. 1962); N. Sobel, Inc. v. Commissioner, 40 B.T.A. 1263, 1265 (1939); 2 Mertens, Law of Federal Income Taxation, sec. 11.19 (1996).

Petitioners argue that the economic realities of the transaction before us reflect that the $1 million stated purchase price for the Ranch was inflated, that it did not accurately reflect the fair market value of the Ranch, and effectively that

because of the unusual payment arrangement with Moncor Bank relating to petitioners' assignment of the installment contracts, petitioners should not be considered liable for the total $1 million stated principal amount of the Bank loan.

Respondent argues that the fair market value of the Ranch was $1 million, that petitioners were liable for the entire $1 million stated principal amount of the Bank loan, and that the payment arrangement between petitioners and Moncor Bank should not be regarded as limiting petitioners' liability for the full $1 million stated principal amount of the Bank loan. Respondent therefore argues that no exception applies to preclude petitioners' recognition of discharge of indebtedness income.

In the instant case, the unusual payment arrangement between petitioners and Moncor Bank relating to the Bank loan casts significant doubt on petitioners' liability for the total $1 million stated principal amount of the Bank loan.

With every sale of a cabin lot, petitioners and Moncor Bank reduced the stated principal amount due on the Bank loan by an amount equal to 95 percent of the cabin lot sales contract, regardless of the receipt by Moncor Bank of any actual installment payments from purchasers of the cabin lots.

When the FDIC refused to honor this payment arrangement with regard to the Bank loan, a legitimate dispute arose regarding the nature and amount of petitioners' liability on the Bank loan. The dispute over petitioners' liability on the Bank loan was

settled in 1988, when the FDIC accepted a $350,000 payment in complete satisfaction of petitioners' liability.  Only at the time of that settlement was the amount of petitioners' liability on the Bank loan finally established.

For the above reasons, we conclude that petitioners' liability on the promissory note to Moncor Bank was sufficiently indefinite in nature and amount to avoid triggering any discharge of indebtedness income when the settlement with the FDIC was reached.  Only at the time of the settlement did petitioners' liability on the Bank loan become fixed and definite and equal to the $550,537 figure agreed to by petitioners and the FDIC.  We conclude that petitioners are not to be treated as having realized the discharge of indebtedness income in dispute herein.

## Section 6651(a)(1) Addition to Tax

Section 6651(a)(1) imposes an addition to tax for the failure to timely file a Federal income tax return.  If a taxpayer can show that the failure to timely file is due to reasonable cause and not to willful neglect, the addition to tax will not be imposed.  Sec. 6651(a)(1).  The burden of proving that their income tax return was timely filed is on petitioners. Rule 142; Welch v. Helvering, 290 U.S. 111, 115 (1933).

To be effective, requests for automatic extensions to file Federal income tax returns must be filed on or before the date prescribed for filing the returns.  Raskin v. Commissioner, T.C.

Memo. 1981-153, affd. 685 F.2d 436 (8th Cir. 1982); sec. 1.6081-4(a)(3), Income Tax Regs.

Petitioners contend: (1) That because they filed a Form 4868, their 1989 tax return was not due until August 15, 1990; and (2) that the complicated nature of their 1989 tax return qualifies as reasonable cause for failure to timely file.

Because respondent did not receive petitioners' Form 4868 until August 20, 1990, the automatic extension that petitioners sought was not triggered, and petitioners' 1989 tax return was due to be filed on April 15, 1990.

Further, petitioners have not established reasonable cause for failure to timely file their 1989 Federal income tax return. The mere fact that preparation of their 1989 return was complicated and that additional time was required to work on the return does not establish reasonable cause for petitioners' late filing.

To reflect the foregoing,

Decision will be entered under Rule 155.