CENTENNIAL SAVINGS BANK
FSB, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 3–86–1396–H.

United States District Court,
N.D. Texas,
Dallas Division.

Jan. 22, 1988.

Edward Koppman & Kathleen St. John, Akin Gump Strauss Hauer & Feld, Dallas, Tex., for plaintiff.

Grover Hartt, III, Walter B. Thurmond, Tax Div., U.S. Dept. of Justice, Dallas, Tex., for defendant.

## MEMORANDUM OPINION AND ORDER

SANDERS, Acting Chief Judge.

In this nonjury case Plaintiff, Centennial Savings Bank FSB ("Centennial"), sues Defendant, United States of America ("government"), to recover federal income taxes collected from Centennial.

The case involves two discrete issues affecting Centennial's federal income tax lia-

bility for the years 1969–1981 (1971 excluded). The first relates to the tax consequences to Centennial of Mortgage Participation Sale Agreements entered into and consummated with the Federal National Mortgage Association ("FNMA") in 1981; the second concerns the tax liability to Centennial of premature withdrawal penalties on certificates of deposit collected by Centennial in 1981 from its depositors. Although a net operating loss was reported by Centennial in 1981 as a result, in part, of both the alleged losses incurred due to the mortgage transaction and attempted deferral of income received from the premature withdrawal penalties on certificates of deposit, the issues surrounding each matter are different, and will be discussed separately.

The Court has jurisdiction and venue by virtue of 28 U.S.C. §§ 1340, 1346, and 1402(a)(2).

## I. THE MORTGAGE TRANSACTIONS

### A. *Factual Background*

Centennial, formerly known as First Federal Savings and Loan of Greenville, is a Texas corporation with its principal place of business in Greenville, Texas. It is a federally insured mutual savings and loan association chartered under the Home Owner's Loan Act of 1933 and subject to review, supervision and regulation by the Federal Home Loan Bank Board ("Bank Board") and Federal Savings and Loan Insurance Corporation ("FSLIC").

In 1981, Centennial's mortgage loan portfolio was composed of whole mortgages on residential property, including conventional, Federal Housing Administration ("FHA"), and Veterans Administration ("VA") mortgages, which had been purchased in part from, and were still serviced by, Southern Trust and Mortgage Company ("STM"). The portfolio was comprised primarily of fixed-rate, long-term mortgage loans which had been issued in the late 1960s at interest rates significantly lower than those charged on more recent loans. The high market interest rates of the late 1970s and early 1980s precluded disposition of these low interest rate loans at their face value; if the loans were sold, the

savings and loan association would receive much less than their face value. At the same time, the profits and cash flow of savings and loan institutions were adversely affected by having to offer higher interest rates on deposits to attract funds for deposit. It became increasingly difficult for savings and loans like Centennial to maintain capital reserves and minimum liquidity ratios imposed by the Bank Board. An examination of Centennial's financial position in February, 1982 by the Bank Board showed that Centennial had an operating deficit of $309,801 for the fiscal year ending December 31, 1981 and a projected deficit in operating results of $471,000 for the six-month period January 1 through June 30, 1982. The principal reason for the deficit was Centennial's high cost of money.

Prior to 1980, savings and loan institutions were required by the Bank Board to record for financial and regulatory purposes any losses resulting from mortgage sales. On June 27, 1980, the Bank Board issued Memorandum R–49 ("R–49"), a regulatory accounting principle, which sets forth criteria that a savings and loan association would have to comply with if it wanted to "reciprocally" sell mortgage loans and not recognize or record for financial and regulatory purposes any loss resulting therefrom. R–49 (Government Exhibit 8) reads as follows:

The purpose of this memorandum is to advise OES staff on the proper accounting for reciprocal sales of mortgage loans.

A loss resulting from a difference between market value and book value in connection with reciprocal sales of substantially identical mortgage loans need not be recorded. Mortgage loans are considered substantially identical only when each of the following criteria is met. The loans involved must:

1. involve single-family residential mortgages,
2. be of similar type (e.g., conventionals for conventionals),
3. have the same stated terms to maturity (e.g. 30 years),
4. have identical stated interest rates,

5. have similar seasoning (i.e., remaining terms to maturity),

6. have aggregate principal amounts within the lesser of 2½% or $100,000 (plus or minus) on both sides of the transaction, with any additional consideration being paid in cash,

7. be sold without recourse,

8. have similar fair market values,

9. have similar loan-to-value ratios at the time of the reciprocal sale, and

10. have all security properties for both sides of the transaction in the same state.

When the aggregate principal amounts are not the same and the principal amount of the mortgage loans purchased is greater than the principal amount of the mortgage loans sold, the purchaser should record the additional principal. The difference between the additional principal and the additional cost should be recorded as a discount and amortized over a period of not less than ten years. If the principal amount of the mortgage loans purchased is less than the principal amount of those originally sold, the difference should reduce its loan account. The difference between the reduction in loans and the amount of cash received should be charged to a loss on sale of mortgage loans.

If a reciprocal sale does not meet all of the above criteria, the institution must record losses resulting from the sale.

On April 13, 1981 Centennial entered into four participation agreements with FNMA, a congressionally chartered corporation which is the principal buyer and seller of mortgages in the secondary mortgage market. Pursuant to these agreements, Centennial acquired a 90% participation in 78 conventional home mortgages from FNMA and a 90% participation in 299 FHA/VA home mortgages from FNMA. FNMA acquired from Centennial a 90% participation in 85 conventional home mortgages and a 90% participation in 335 FHA/VA home mortgages. These reciprocal loan transactions met all of the requirements of R–49. Also, the loans adhered to several additional guidelines set by FNMA, which resulted in even greater similarity between the loans exchanged. Included in the FNMA guidelines was the requirement that all loans not have been delinquent for more than thirty days during the previous year. The transactions were made for the following cash payments:

| LOAN CLASS | CENTENNIAL'S RECEIPTS | FNMA RECEIPTS | DIFFERENCE TO CENTENNIAL |
|---|---|---|---|
| Conventional | $1,827,784.47 | $1,827,788.15 | $[3.68] |
| FHA/VA | 3,834,258.57 | 3,834,256.42 | 2.15 |
| | $5,662,043.04 | $5,662,044.57 | $[1.53] |

The face amounts of the mortgage participation agreements by Centennial and FNMA were as follows:

| LOAN CLASS | LOANS CENTENNIAL TRANSFERRED | LOANS FNMA TRANSFERRED | DIFFERENCE TO CENTENNIAL |
|---|---|---|---|
| Conventional | $2,655,891.41 | $2,655,896.76 | $[5.35] |
| FHA/VA | 5,825,370.06 | 5,825,366.80 | 3.26 |
| | $8,481,261.47 | $8,481,263.56 | $[2.09] |

Thus, because the mortgages included in the reciprocal sale bore an interest rate that was lower than the then prevailing interest rate for such mortgages,[1] Centennial suffered a loss of $2,819,218.43 in 1981, which it (properly per R–49) did not

---

1. The mortgages in these transactions bore interest rates ranging from 6.75–9.875%, rates significantly lower than the market rate prevailing on April 13, 1981.

record for financial and regulatory purposes. This figure represents the difference between Centennial's acquisition cost, i.e., basis, of its old mortgages and the amount Centennial received from FNMA for these mortgages. However, Centennial claimed a tax loss for this amount in 1981.[2] Since Centennial was already in a loss position for that year, the tax loss was used to create a net operating loss and carried back to eliminate all of Centennial's tax liabilities beginning in 1969 through 1980 (1971 excluded). This claimed tax loss is the main source of controversy in this suit.

In determining the tax consequences of the reciprocal loan transactions, the method by which the mortgage loans were selected and matched beforehand deserves mention. Centennial had STM, its loan servicer, prepare two computer tapes—one for conventional and the other for FHA/VA mortgages—and provided them to FNMA to be matched with FNMA's loans, in strict compliance with R–49 and FNMA criteria.[3] Centennial did not review the loans before sending them to FNMA. As a result of the matching process, the mortgages were paired precisely by mortgage type (conventional or FHA/VA) and interest rate. They also had nearly the same remaining years to maturity, loan to value ratios, and aggregate principal balances.[4]

Centennial received a computer printout from FNMA approximately one week before the reciprocal loan transactions were entered into, designating the two groups of mortgages which had been paired. Centennial did not object to any of the mortgages transferred to it by FNMA. Although Centennial had underwritten each of the mortgage loans it transferred, it conducted no new credit checks, appraisals, or underwriting of the loans it was receiving, nor did it review any of the mortgage file documents related to these loans.[5] Testimony of Henley. Centennial was, however, given the addresses of the residential property which provided the collateral for the mortgages it received and it conducted visual inspections of several of the Dallas area properties prior to signing the four loan agreements. Centennial was able to ascertain that the mortgages sold by Centennial were concentrated in north Texas, while the loans Centennial acquired were located throughout more counties in Texas and were located in a greater number of cities.

The pricing or valuation of all paired mortgages in the four participation sales agreements was established by reference to FNMA's new money auction rate for April 1981. To arrive at a price, one common discount factor was applied to each side of the transaction on all conventional loans. The same was done for all FHA/VA loans using a slightly different discount factor.[6] Charles Senning, Centennial's Chief Executive Officer, testified that these discount rates were dictated by FNMA and were not negotiable. The value of each individual loan was therefore not established by Centennial. The two participation sales agreements on each side of the transaction were consummated by conveyance of 90% interests in the group of conventional loans and the group of FHA/VA loans together with a simultaneous wire transfer of money by both Centennial and FNMA to the other's account. As Centennial did not have the $5,662,-

---

2. Like Centennial, FNMA did not claim a loss for financial or regulatory accounting purposes, but did claim a tax loss. FNMA has participated in numerous R–49 transactions and has claimed millions of dollars in reduced taxes—the subject of other litigation across the country.

3. Evidence at trial indicated that FNMA disqualified some of the mortgages Centennial transferred, because they failed to meet the requirements of R–49. Testimony of Senning.

4. Testimony at trial (Spatt) revealed that the aggregate principal balances of the loans were matched more closely than R–49 required.

5. In fact, Centennial did not receive until 1987 any files on the loans it acquired in 1981. These file documents ordinarily reveal such information as the identity of mortgagors, notes, deeds of trust, loan applications, appraisals, credit reports, employment confirmations, and loan to value ratios. Evidence at trial suggested that this information was not available from FNMA in 1981. Testimony of Senning.

6. On all conventional loans, a FNMA auction rate of 15.419% was converted to a price of 68.82 by using a discount factor of 31.18. On all FHA/VA loans, a FNMA auction rate of 15.743% was converted to a price of 65.82 by using a discount factor of 34.18.

044.57 to cover the payment it made to FNMA, it borrowed funds from the Bank Board. In doing so, Centennial incurred one day's interest on the loan, which it immediately repaid with the $5,662,043.04 received from FNMA for the loans transferred. After completion of the transactions, STM continued to service the mortgage participation interests conveyed to FNMA, as it had prior to the agreements. Centennial continued to receive monthly remittance reports from STM and retained 10% of the remittances, while forwarding the remaining 90% to FNMA. Likewise, Centennial's new participation interests continued to be serviced by FNMA's seventy-six loan servicers for these particular mortgages. Centennial also received 90% remittances from this arrangement. Thus, while mortgage ownership interests were conveyed in the transactions, the actual mortgages never changed hands, and borrowers were not aware that the transaction had taken place. Testimony of Senning.

On February 4, 1982, Centennial filed for a tentative allowance of refunds for the taxable years 1969 through 1980 (1971 excluded) resulting from the carry-back of the claimed $2,819,218.43 loss sustained as a result of the reciprocal loan agreements. Disallowance of this claimed loss by the government led to the assessments made against Centennial, and ultimately to this litigation.

### B. *Contentions of the Parties*

Centennial contends that this case focuses on the "simple question" of whether it sold and/or exchanged its 90% interests in conventional and FHA/VA loans, either of which would result in a realization event for tax purposes, allowing Centennial to claim its alleged loss of $2,819,218.43 in 1981.

Centennial first argues that the conveyance of mortgage loans to FNMA for cash constituted a sale and therefore, *ipso facto*, a realization event, and that the sale was bona fide because Centennial actually and permanently disposed of 90% interests for a fair market value. Alternatively, Centennial argues, if the transaction is characterized as an exchange, a realization event also occurred, because the mortgage loans Centennial received from FNMA did not confer the same interest in the same property as the mortgage loans Centennial transferred to FNMA in the exchange. Centennial maintains that there are numerous differences between the mortgages it conveyed and those it received, and that the mortgage loans should be looked at individually rather than as four "pools" of conventional and FHA/VA loans.

To begin with, Centennial says that it disposed of loans in which it originally held a 100% interest while receiving from FNMA in return 90% participatory interests in loans. The mortgages Centennial transferred were serviced by one servicer, whereas those it acquired were serviced by over seventy servicers. The obligors on and the property securing each mortgage in the transaction were also different from one another. Centennial maintains that borrowers can vary in innumerable ways, including age, education, occupation, life expectancy, credit attitudes, etc. Furthermore, the participations conveyed by Centennial were secured by property concentrated in north Texas, and were predominantly in urban areas, while those it received were secured by properties dispersed throughout Texas and situated in more rural locations. The mortgages Centennial transferred were also concentrated in more "mobile" areas than the mortgages it received; that is, areas where homeowners move on a frequent basis. Testimony at trial by Christine Henley and Charles Senning, officers of Centennial, and by John Danforth, an expert witness for Centennial, suggested that, based on their past experiences, the more mobile and urban an area is, the greater likelihood that mortgages will be prepaid or defaulted on.[7] This information, they claim, was known by Centennial at the time of the R–49 transaction. Mr. Danforth also testified that the inherent differences in borrowers and in location of collateral placed Centennial in

---

**7.** Information collected in 1987 regarding post-transaction performance of the loans, which was presented at trial, showed that these predictions in fact proved true. Centennial Exhibits 28 and 29.

an economic position after the reciprocal sale transaction significantly different from its economic position before the transaction. Centennial argues that the ten criteria required to match the mortgage loans in an R–49 transaction do not account for the numerous differences that Centennial alleges existed between the purchased and sold mortgages. Therefore, Centennial contends, the "substantially identical" standard of R–49 is irrelevant in determining what constitutes a realization event for tax purposes.

The government responds that Centennial is not entitled to realize a $2,819,218.43 tax loss because Centennial's reciprocal sale of mortgages is, in fact, a "disguised exchange" or "swap", which left Centennial in the same economic position both before and after the mortgage transaction. The government argues that the transaction was a single inseparable deal. It points to the simultaneous transfer of identical interests in identical types of loans which, after an exchange of over $5 million, resulted in only a $1.53 in additional cash. It claims that the transaction was structured as an exchange to comply with R–49's reciprocal requirements, so that neither Centennial nor FNMA had to record a loss from the transaction on either financial or regulatory reports.

The government contends that this "exchange" involved mortgages which were, according to R–49's criteria, "substantially identical," and for tax purposes, "not materially different in kind or extent." It claims that four "pools" of mortgages resulted from the transaction (one conventional pool and one FHA/VA pool on each side of the deal) and points to testimony from Mr. Danforth, an expert witness for Centennial, that secondary mortgage market transactions normally involve pools or packages of loans. In fact, in this instance pricing was accomplished on a pool-wide basis and therefore did not take individual differences of the loans into account.[8] The government produced expert testimony from Chester Spatt to show that the differences among the loans which had been enumerated by Centennial were immaterial and irrelevant in the context of the secondary mortgage market. In order for there to be a basis for distinguishing among financial assets, such as the mortgage loans in this transaction, information on specific variables common to the four pools would have to be known at the time of the transaction in order to influence cash flow expectations in the market place.[9] Mr. Spatt's testimony further suggested that based on the lack of information available in April, 1981 to Centennial and the market in general regarding differences in individual borrowers or collateral in the mortgage exchange, the market would not have been in a position to perform materially distinct prepayment to default expectations for the reciprocal sale of the loans. R–49 criteria, on the other hand, related to fundamental characteristics in the economy which were known to the market at the time of the transaction. The characteristics were not materially distinguishable in kind or extent in the eyes of the market because of the similarity of the cash flow expectations among the four sets of mortgage pools.

Alternatively, the government contends that since Centennial did not report a loss for financial and regulatory purposes, it cannot realize a loss for tax purposes. It argues that since Centennial's accrual method of accounting, which follows generally accepted accounting principles ("GAAP") and regulatory accounting principles ("RAP") clearly reflected that Centennial realized no loss on the exchange of mortgages in 1981, then under I.R.C. § 446,[10] Centennial's taxable income should

---

**8.** The government elicited testimony from Mr. Senning, Centennial's Chief Executive Officer, that default and prepayment predictions regarding the loans at the time of the transaction could only have been done on a pool-wide rather than on an individual basis.

**9.** This theory is commonly referred to as the Capital Asset Pricing Model.

**10.** Section 446, entitled "General rule for methods of accounting," provides, in part:

(a) *General rule.*—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

(b) *Exceptions.*—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income.

have been computed on the same basis. Centennial responds that financial and regulatory accounting methods do not govern the realization of tax gains or losses, and that a taxpayer's "method of accounting" in keeping its "books" is not controlled by GAAP or RAP financial statements.

Even if a loss is "realized" under the Code, the Government contends that the loss should not be "recognized" for tax purposes because I.R.C. § 1091 applies to the present case. Section 1091 provides that a loss realized on the sale of stock or securities should not be deducted if, within a 30 day period before or 30 day period after the sale, the taxpayer reacquires "substantially identical" stock or securities. The government argues that the mortgages involved in the exchange between Centennial and FNMA should qualify as "stock or securities" since mortgages are debt instruments secured by collateral. Furthermore, the government urges, since the pools were substantially identical, the mortgages fall within the ambit of Section 1091. Centennial responds that Section 1091 is nonapplicable to the present case, because the mortgages involved in the reciprocal sales agreements do not constitute "stock or securities" within the meaning of Section 1091. Instead, Centennial claims, Section 1091 refers only to bonds, debentures or other obligations which are fungible with other debt instruments in the same class. Additionally, it submits that bilateral contracts are not securities.

Finally, the government contends that should the Court find that the loss claimed by Centennial is to be realized and recognized, the loss still does not qualify as a tax deduction. In order to be deductible, the government argues that the loss must be bona fide and have a business purpose aside from any tax considerations. It asserts that Centennial's reciprocal agreement was devised exclusively to reduce Centennial's tax liabilities and that it lacked economic substance and validity. The government adduced deposition testimony from Robert Mahn, Senior Vice–President of FNMA, that the only additional capital derived from the R–49 transaction was money received as the result of a tax benefit. Even though savings and loan institutions were in dire need of additional capital, the transaction itself did not generate any new funds. Furthermore, Christine Henley, Centennial's Vice–President, admitted during trial that although Centennial could predict at the time of the R–49 transaction that the loans it was transferring to FNMA would prepay faster, thus generating needed capital, Centennial nonetheless decided to transfer the loans. The government further contends that the agreements did not constitute a bona fide transaction entered into with a legitimate non tax-motivated business purpose as its primary objective. It points to the fact that FNMA auction rates were automatically applied to the loans to determine their price without any arms length negotiations. It also points to the reports prepared by Centennial's accountants before the agreements were signed which reflect the carefully calculated amount of expected refund, including interest. Centennial Exhibit 1. In addition, the government submits that the association's Board minutes during this time reflect only the desire for a tax refund. Government Exhibit 6.

Centennial responds that the government's arguments are merely "glosses" on the realization doctrine. Centennial contends that a business purpose is not a necessary prerequisite for a tax deduction; in any event, Centennial says it had several business purposes for the transaction. These included diversifying its collateral, decreasing the risks inherent in a geographically concentrated loan portfolio, decreasing its delinquency rate, and improving the quality of the mortgage servicing it received. Additionally, Centennial wanted

(c) *Permissible methods.*—Subject to the provisions of subsections (a) and (b), a taxpayer may compute taxable income under any of the following methods of accounting—
  (1) the cash receipts and disbursements method;
  (2) an accrual method;
  (3) any other method permitted by this chapter; or
  (4) any combination of the foregoing methods permitted under regulations prescribed by the Secretary.
I.R.C. § 446(a), (b), and (c).

to launch itself into the secondary mortgage market, get acquainted with FNMA, and educate its officers and employees about secondary mortgage market transactions generally.

### C. *The Exchange of Mortgages*

Centennial's claim for a refund with respect to its R–49 transaction in the secondary mortgage market presents the Court with a case of first impression. At the outset, the Court must determine whether or not the mortgage transaction constituted an event which caused the realization of a loss to Centennial. Section 1001 of the Internal Revenue Code provides, in part:

(a) *Computation of gain or loss.*—The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.

(b) *Amount realized.*—The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received ...

The first step in resolving the realization question is to determine whether the mortgage loan agreements are properly characterized as a sale or as an exchange.

As a general rule, the substance of a transaction controls its tax consequences rather than its form or the label given to it by the taxpayer. *Diedrich v. Commissioner of Internal Revenue,* 457 U.S. 191, 102 S.Ct. 2414, 72 L.Ed.2d 777 (1982); *Commissioner of Internal Revenue v. P.G. Lake, Inc.,* 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958); *Commissioner of Internal Revenue v. Court Holding Co.,* 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945). Through most of its argument, Centennial refers to the transaction as a sale. However, merely calling the transaction a sale, does not make it one. Centennial urges that its disposition of conventional and FHA/VA loans for cash should be the sole focus of the Court's analysis.

The court in *Crenshaw v. United States,* 450 F.2d 472 (5th Cir.1971), *rev'g,* 315 F.Supp. 814 (N.D.Ga.1970), *cert. denied,* 408 U.S. 923, 92 S.Ct. 2490, 33 L.Ed.2d 333 (1972), addressed this same approach:

[Taxpayers] cannot compel a court to characterize the transaction solely upon the basis of a concentration on one facet of it when the totality of circumstances determines its tax status. The most obvious answer to Taxpayer's argument that the parties' characterization is conclusive is that such a result would completely thwart the Congressional policy to tax transactional realities rather than verbal labels ... Otherwise, form, rather than substance, would invariably prevail.

*Id.* at 477–78. The Court is unable to accept Centennial's position that one aspect of the transaction should be analyzed separate and apart from the substance of Centennial's and FNMA's coordinated actions. Centennial's position ignores the reality of FNMA's concomitant role in the mortgage transaction, which was vital to the success of meeting the requirements of R–49, the centerpiece of the parties' deal.

In this light, the Court examines the entire situation surrounding the "reciprocal sale," and finds that what took place was an exchange of mortgage loans. The Fifth Circuit in *Yarbro v. Commissioner of Internal Revenue,* 737 F.2d 479 (5th Cir. 1984), *reh'g denied,* 742 F.2d 1453 (5th Cir.1984), *cert. denied,* 469 U.S. 1189, 105 S.Ct. 959, 83 L.Ed.2d 965 (1985), held that an "exchange" requires a giving, a receipt, and a connection between two things regarded as equivalents. *Id.* at 483. In *Carlton v. United States,* 385 F.2d 238 (5th Cir.1967), the court ruled that "[t]he very essence of an exchange is the transfer of property between owners, while the mark of a sale is the receipt of cash for the property," *id.* at 242, but scrutinized whether the cash in question was earmarked for the subsequent purchase, noting that the receipt of funds which are "unfettered and unrestrained" signifies a sale of the property. *Id.* at 243. *See also, Swaim v. United States,* 651 F.2d 1066 (5th Cir.1981). Although *Carlton* and *Swaim* dealt with I.R.C. § 1031, which refers to exchanges of like kind property

(excluding among other things, evidences of indebtedness) used in a trade or business or for investment, the definition of an exchange in these cases is useful in the instant case.

The Court finds that the funds received by Centennial and FNMA from one another in the reciprocal sales transaction were inextricably linked. By the very nature of R–49's reciprocity, the cash, which was wired on the same day to both Centennial's and FNMA's respective accounts, cannot be considered to be anything other than precommitted to the closing of the deal.[11] That the transaction was an exchange is also reinforced by the evidence that the pricing of the loans was not negotiated but was dictated by FNMA, and that the exchange of over $5 million in mortgages by each party, resulted in a difference of only $1.53 cash. Under these circumstances, the *form* of contemporaneously wiring money to bank accounts in order to purchase mortgages camouflages what is, in *substance*, a simple exchange of mortgages.

A finding that the groups of mortgages were exchanged does not end the inquiry. Even an exchange can be a realization event under Section 1001 of the Code. To complete the analysis, the Court must also decide whether the loans exchanged differed from one another to an extent or in such a way as to leave Centennial in a different economic position after the transaction. In other words, after the reciprocal mortgage transaction, was Centennial actually poorer to the extent of the loss claimed?

The parties disagree on the proper standard to apply in determining to what extent the loans must be different in order for Centennial to be able to realize a loss. The Government urges that the correct approach is to look to Treas.Reg. § 1.1001–1(a), which states:

Except as otherwise provided in Subtitle A of the Code, the gain or loss realized from the conversion of property into cash, or from the exchange of property for other property *differing materially either in kind or in extent,* is treated as income or a loss sustained ... (emphasis added).

In the government's view, the computer-matched loans which adhered to specific criteria so as to make them "substantially identical" under R–49, cannot differ materially. According to Centennial, Section 1.1001–1(a) is nothing other than a shorthand reference to the realization cases and has no independent significance outside of their holdings. Centennial submits that a realization of a loss occurs when there is a complete disposition of an interest in an asset whether by means of a sale or an exchange, as long as an "identical" asset is not acquired in exchange. Centennial bases this broad interpretation of a realization event on *Marr v. United States,* 268 U.S. 536, 45 S.Ct. 575, 69 L.Ed. 1079 (1925); *Weiss v. Stearn,* 265 U.S. 242, 44 S.Ct. 490, 68 L.Ed. 1001 (1924); and *Eisner v. Macomber,* 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521 (1920). In Centennial's view, the mortgage loans exchanged were not identical; and if the Court decides that Section 1.1001–1(a) applies to the transaction, the loans were also not materially different in kind or extent.

The Court agrees with Centennial that *Macomber, Weiss,* and *Marr* are important cases to consider in determining when a realization event has taken place for tax purposes, but finds that Centennial's analysis of them ignores the fundamental reasoning of the cases. In *Eisner v. Macomber, supra,* the taxpayer received a pro rata stock dividend (as opposed to a capital dividend) which increased the number of shares of stock she held in the corporation, but did not change the percentage of her stock in the corporation in relation to other shareholders. The Court found that stock certificates were only legal rights with respect to the corporation's entire assets, and the stockholder was receiving nothing out of these assets for her separate use and benefit. Accordingly, no income was realized as a result of the transaction. While

---

**11.** The Court notes that Centennial had to borrow funds from the Bank Board in order to cover its side of the transaction, incurring only one day's interest because it was able to repay the loan almost immediately upon receiving the cash from FNMA's "purchase."

Centennial emphasizes that the rights of the stockholder in *Macomber* remained the same despite issuance of the stock dividends, the Court in that case also made it clear that "the corporation is no poorer and the stockholder no richer than they were before." *Id.* at 203, 40 S.Ct. at 191–92. Thus, there was no change in the taxpayer's economic wealth after the transaction was completed.

In *Weiss v. Stearn, supra,* the Court examined a scheme whereby an existing corporation had been liquidated, assets of the corporation were transferred to a newly formed corporation within the same state, and money was circuitously transferred by the new investors back to the old shareholders. This resulted in the new investors holding 50% of the stock in the new corporation and the old shareholders receiving the cash therefrom. In applying a substance over form analysis to the multi-step transaction, the Supreme Court held that a gain was realized with respect to the one-half of the stock sold for cash; however, with respect to the other half of the stock retained by the old shareholders, the Court stated:

> We can not conclude that mere change for purposes of reorganization in the technical ownership of an enterprise, under circumstances like those here disclosed, followed by issuance of new certificates, constitutes gain separated from the original capital interest. *Something more is necessary—something which gives the stockholder a thing really different from what he theretofore had.*

*Weiss,* 265 U.S. at 254, 44 S.Ct. at 491–92 (emphasis added). This language does not support Centennial's broad conclusion that *Weiss* stands for the proposition that a realization event occurs in all instances other than when a taxpayer is left with "identical interests in identical assets" following a transaction. Although the stock interests in *Weiss* remained essentially the same after the "reorganization" of the corporation, it does not automatically follow that that situation determines the standard to be applied in denying the realization of a gain or loss in all cases and contexts. While the *Weiss* Court suggests that, for a realization event to occur, "something more is necessary"—the facts of that case, because the stock interests had stayed the same, do not provide an answer to what "a thing really different" might be.

Similar in some respects to *Weiss, Marr v. United States, supra,* sheds further light on this issue. A new corporation was organized in a different state to take over the assets and assume the liabilities of an old corporation. The Court in *Marr* held that the new securities which were issued were not stock dividends and that a gain was realized on the value of new stock above the cost of the old securities. It made particular note of the fact that the corporations had been organized in different states with laws reflecting different rights and powers, and that a 6% non-voting preferred stock in the new company was "essentially different" from a 7% voting preferred and common stock, subject to different amounts of preferred stock priorities and to a different amount of annual dividend on the preferred stock. *Marr,* 268 U.S. at 541–42, 45 S.Ct. at 577. Thus, the Court more carefully defined how closely related property involved or exchanged in a transaction must be in order to determine whether a gain or loss is realized, focusing on economic variables in differentiating the two.

### D. *The Mortgages Were Not Materially Different*

■ It is well recognized that the realization of a loss is governed by the same precepts as the realization of a gain. I.R.C. § 1001. The Court concludes that the standard under Treas.Reg. § 1.1001–1(a) requiring that the property exchanged in a transaction be materially different in kind or extent before a loss will be realized, is applicable to the mortgage loan agreements in the present case. The validity of this standard finds clear support in *Weiss* and *Marr.* Moreover, Treasury Regulations, in general, are given great deference in interpreting the Internal Revenue Code, and have the effect of law as long as they are correctly promulgated and reasonable and are not plainly inconsistent with the statute that authorizes them. *United States v. Correll,* 389 U.S. 299, 305–307, 88 S.Ct. 445, 448–50, 19 L.Ed.2d 537 (1967);

*Commissioner of Internal Revenue v. South Texas Lumber Co.*, 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1947). The Court finds that Treas.Reg. § 1.1001–1(a) meets these criteria and that it reflects the reality that property exchanged does not have to be absolutely identical to leave a taxpayer in a similar economic position before and after an exchange.

■ After reviewing all of the testimony, evidence, and theories presented in this case, the Court is of the opinion that the conventional and FHA/VA loans which Centennial exchanged with FNMA were not materially different from those it received. *See* Rev.Rul. 85–125, 1985–2 C.B. 180 (where Internal Revenue Service reached same conclusion with respect to a R–49 transaction); *cf.*, Rev.Rul. 81–204, 1981–2 C.B. 157. In making this determination, the Court gives effect to the economic realities in existence *at the time of the transaction.*

Those economic characteristics of the mortgages which meet the R–49 criteria were clearly known to the market place in April, 1981. R–49 severely restricted potential differences between the loans, and additional criteria added by FNMA restricted them to an even greater extent. All the loans involved single-family residential mortgages and were matched by the same loan type, interest rates and stated terms to maturity. They also were paired according to substantially similar remaining terms to maturity and aggregate principal balances, with no loan delinquent for more than thirty days during the last year. The R–49 criteria assured that the mortgages after the matching process would not be materially different.

Moreover, while the "substantially identical" language within R–49 is not a standard promulgated under the Internal Revenue Code, it is relevant in determining whether material differences existed between the loans in this transaction. It was obviously the intent of R–49 that once the strictures imposed by its ten criteria were met, the mortgages would be so closely paired as to be "substantially identical." The Court therefore has given weight to the R–49 "substantially identical" standard

in reaching its decision that the loans were not materially different in kind or extent.

Furthermore, in light of the Danforth testimony that the secondary mortgage market routinely deals with packages of mortgages and after reviewing the manner in which the mortgages in this transaction were matched and priced, the Court finds that "pools" of mortgages (two conventional and two FHA/VA) were swapped with little if any reference to possible differences in the individual characteristics of the loans involved. Centennial conducted no new appraisals or credit checks of the computer-matched loans it was to receive in the transaction. The Court finds it difficult to attach significance to loan characteristics of which Centennial itself had no knowledge at the time of the transaction.

Centennial argues that although precise information regarding the loans may not have been known at the time of the "reciprocal sale," it could be predicted based on inherent differences which existed among individual borrowers and location of collateral that the loans would perform differently and thus place Centennial in a different economic position as a result. However, the Court, mindful of the evidence presented by Centennial providing possible correlations between individual differences among the loans and prepayment and default tendencies, finds that these predictions provide an uncertain basis upon which to determine a change in Centennial's economic position. The Court is persuaded by the testimony of Mr. Spatt, the government's expert, which suggested that because information was not available at the time of the transaction regarding individual differences among the loans, the market place was unable to and did not differentiate between the pools. Lacking economic relevance, these differences were not materially distinguishable and were therefore irrelevant, especially to a secondary mortgage market dealing in pools of similarly seasoned mortgages.

### E. *There Was No Loss Realized*

In order to be deductible, "losses must be 'realized' by some closed 'identifiable event' ... and [the Internal Revenue Code] requires such losses to be actual and real."

(cites omitted). *Shoenberg v. Commissioner of Internal Revenue,* 77 F.2d 446, 448 (8th Cir.1935), *cert. denied,* 296 U.S. 586, 56 S.Ct. 101, 80 L.Ed. 414 (1935). The realization of a loss must be evidenced by an event which makes the taxpayer "poorer to the extent of the loss claimed." *Id.* at 449; *see also Macomber,* 252 U.S. at 203, 40 S.Ct. at 191.

■ While R–49 provided the basis for a valid transaction, it also prevented the realization of a tax loss. Centennial was no poorer after the transaction than before. It reflected no loss on its books for regulatory and accounting purposes and thereby avoided problems with its depositors, investors, and regulators. It appears to the Court that by means of the mortgage swap, Centennial hoped to create a loss without any real change in its economic status.

Taxation, however, is concerned with realities rather than appearances, *Crenshaw v. United States,* 450 F.2d 472, 475 (5th Cir.1971), and no loss can be claimed that is not real. The loss which Centennial claims it suffered as a result of the transaction is the paper loss it had been suffering all along because its old fixed-rate mortgages had declined in value. A decline in valuation without realization, however, is not enough to entitle an institution to deduct a loss. *Anderson Clayton & Co. v. United States,* 562 F.2d 972, 988 (5th Cir.1977), *reh'g denied,* 565 F.2d 1215 (5th Cir.1977), *cert. denied,* 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785 (1978).

A taxpayer has a right to arrange his affairs as he wishes, with tax considerations in mind; however, this must be done within the framework of applicable tax law. *Gregory v. Helvering,* 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596 (1935). While Centennial possibly had business purposes for entering into the transaction with FNMA, an issue which the Court does not reach, the Court considers that the most certain and immediate economic benefit to Centennial was the opportunity to take a substantial tax loss without claiming a loss

on its books. In fact, the Court can find no other rationale for R–49. Although Centennial was admittedly in great need of cash, given the economic climate and its financial position in 1981, the "reciprocal sale" generated no new funds (except for $1.53), since Centennial and FNMA each received two pools of old, fixed-rate, low-interest mortgages in return for the mortgages it transferred. If Centennial claims the benefits of alleged business purposes for entering into the R–49 transaction, it must also bear the burdens. It cannot have its cake and eat it too.

There is no realized loss. The Court therefore does not reach the other issues raised regarding the R–49 loan transaction.

## II.  THE CERTIFICATES OF DEPOSIT

During 1981, Centennial had liabilities on its books in the form of certificates of deposit. Each certificate of deposit agreement required the depositor to keep the funds on deposit with Centennial for a fixed term, which varied according to the length of time a depositor chose to invest his funds. Should the principal amount of a certificate be withdrawn before maturity, the depositor was subject to a "premature withdrawal penalty"; that is, the depositor received back an amount of money which consisted of the principal on deposit plus interest to date of withdrawal, less the penalty for the premature withdrawal. The penalty was always exacted by Centennial at the time the certificate of deposit was withdrawn. The penalty, also called a forfeiture, was predetermined and the amount was prescribed by federal law. *See* 12 C.F.R. § 1204.103 (1981).[12] In 1981, Centennial received $258,019 as a result of premature withdrawals on certificates of deposit.

It is undisputed that gross income under I.R.C. § 61(a) means "all income from whatever source derived." Gross income includes "income from the discharge of indebtedness" under Section 61(a)(12). Section 108(a)(1)(C) provides as follows:

> Gross income does not include any amount which (but for this subsection)

---

**12.**  12 C.F.R. § 1204.103 is promulgated by the Depository Institutions Deregulation Committee (DIDC), which was established by the Depository Institutions Deregulation Act of 1980, 12 U.S. C. § 3502 (1980).

would be includable in gross income by reason of the discharge (in whole or in part) of indebtedness of the taxpayer if the indebtedness discharged is qualified business indebtedness.

Section 108(d)(4)(A) defines qualified business indebtness as indebtedness "incurred or assumed by a corporation," and Section 108(c) allows a corporation to reduce the adjusted basis of its depreciable assets under Section 1017 [13] by the amount of indebtedness.[14]

■ Centennial contends that it properly characterized the income it received from the premature withdrawal penalties as "income by reason of the discharge of indebtedness" under Section 108 and thus, in conjunction with Section 1017, should be allowed to reduce its adjusted basis in depreciable assets over a number of years rather than including the forfeiture amounts in its gross income in 1981. The government is in agreement that these amounts realized by Centennial represent income. However, it disagrees that the penalties represent income realized by the discharge of indebtedness. It contends that the rationale of the Tax Court in *Colonial Savings Association v. Commissioner*, 85 T.C. 855 (1985) is dispositive of the certificates of deposit issue. Centennial does not dispute that *Colonial Savings* is directly on point; instead, it submits that the case is wrongly decided and should not be followed by this Court. Since it appears that the facts are not in dispute, the only issue to be resolved by this Court is a legal one: Are the premature withdrawal penalties associated with the certificates income from the discharge of indebtedness within the meaning of Sections 61(a)(12) and 108?

In *Colonial Savings*, the Tax Court concluded that premature withdrawal penalties realized by a savings and loan institution on certificates of deposit did not constitute income realized by reason of the discharge of indebtedness. The Tax Court held that the penalty agreed to in advance, is "a separate and distinct obligation required of depositors for early withdrawal and not a forgiveness or discharge of debt. The debt to the depositor was not canceled or discharged, it was simply reduced." *Id.* at 861. The Tax Court explained that Section 108 only applies to "pure" cancellation of indebtedness income, not to an instance, like the one before it, where forfeiture was only a "method" by which a creditor makes a payment to a debtor. *Id.* at 866. (citing *OKC Corp. & Subsidiaries v. Commissioner*, 82 T.C. 638, 649 (1984) and *Spartan Petroleum Co. v. United States*, 437 F.Supp. 733, 737 (D.S.C.1977)). After reviewing the legislative enactments which preceded Sections 108 and 1017 providing relief for bankrupt and insolvent debtors in the form of a basis reduction, the Tax Court found that a similar need for relief was absent under the circumstances of the case before it. It thus concluded that any hardship that the savings and loan association might have suffered was sufficiently compensated for by the forfeiture payment, prior use of depositors' funds, and a tax deduction for interest credited and not necessarily paid.[15]

Centennial disagrees with the conclusion reached in *Colonial Savings* in several respects. It submits that the certificate of deposit agreement is a contract which creates a debtor-creditor relationship between

13. Section 1017 provides, in part:
  (a) *General rule.*—If—
    (1) an amount is excluded from gross income under subsection (a) of section 108 (relating to discharge of indebtedness), and
    (2) under subsection ... (c)(1)(A) of section 108, any portion of such amount is to be applied to reduce basis,
then such portion shall be applied in reduction of the basis of any property held by the taxpayer at the beginning of the taxable year following the taxable year in which the discharge occurs.
  I.R.C. § 1017(a).

14. The Court notes that the parties did not discuss in their briefs, and the Court therefore does not address, the fact that the applicable law in this case under §§ 108 and 1017 was repealed in the 1986 revision of the Internal Revenue Code.

15. Regarding this latter deduction, the Tax Court explained: "Because a certificate may not mature prior to the end of petitioner's [taxpayer's] taxable year, petitioner may have enjoyed some deferral without secs. 108 and 1017. The penalty may fall into a subsequent year and not have the tax effect of 'washing out' in the same taxable period." *Colonial Savings*, 85 T.C. at 867, n. 24.

Centennial and its depositors. Centennial maintains that the premature withdrawal aspect of the agreement is not separate from the certificate of deposit contract. The agreement, it contends, calls for Centennial to repay the borrowed amounts plus interest at maturity; at any earlier time, Centennial is to pay a lesser amount. Centennial argues that it was discharged from a portion of its indebtedness by paying less to its depositors than the total amount of its debt. The Court agrees.

A taxpayer may realize income by paying an obligation at less than its face value. *United States v. Kirby Lumber*, 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131 (1931). In *Kirby Lumber*, a corporation retired a portion of its own bonds after purchasing them at a price less than the face value which it had received for them when issued. The Supreme Court found that the excess of the issuing price over the purchase price constituted an accession to income, which has been characterized as the income from the discharge of indebtedness. The Court in the present case finds the *Kirby Lumber* rationale to be applicable to the premature penalty issue. When a depositor opens a certificate of deposit account with Centennial, Centennial becomes indebted to its customer for both the principal deposited and the future interest earned. A part of this agreement is that Centennial, the debtor, is excused or discharged from paying its full obligation to the depositor, a creditor, should the depositor withdraw funds prematurely. In 1981, Centennial paid its total obligation under certain certificate of deposit agreements at a lesser amount than the agreement called for, because it was allowed to keep a forfeiture amount resulting from depositors' early withdrawals. Thus, like the corporation in *Kirby Lumber*, Centennial "realized within a year an accession to income." *Id.* at 3, 52 S.Ct. at 4.

The government argues that the predetermined, fixed nature of the withdrawal penalty distinguishes the present case from *Kirby Lumber*. The government focuses on the fact that the penalty did not correspond to a discount linked to prevailing market interest rates and was instead a form of liquidated damages.

The Court finds this reasoning misplaced. The early withdrawal penalty provision in the certificate of deposit agreement does not constitute a separate contract, and the fact that the penalty was predetermined does not transform it into one. The Court finds that no *separate* payment was made, whether it was fixed or based on market rates. Moreover, contrary to the Tax Court's holding in *Colonial Savings*, the "purity" of the cancellation of indebtedness represented by the forfeiture income in this case is not at issue, because the penalty provision is an integral part of the contract, not merely an ancillary "method" or "medium" by which the debt was reduced. Thus, the penalty income was liquidated debt, not liquidated damages.

The Court concludes that the $258,019 received by Centennial in 1981 as a result of premature withdrawal penalties constitutes income "by reason of" a discharge of indebtedness within the meaning of both Sections 61(a)(12) and 108. Because there was but one contract, income received by Centennial from premature withdrawals was a direct result of depositors discharging Centennial from its indebtedness to them. The Court further finds that under Section 108(d)(4), the indebtedness was "qualified business indebtedness," thus permitting Centennial to have the tax basis of its property reduced pursuant to Section 1017. Finally, the Tax Court's discussion in *Colonial Savings* regarding the legislative background to Sections 108 and 1017 mentioned, but failed to take into account, that in 1942 Congress removed the unsound financial condition requirement,[16] thus allowing *all* corporations to avail themselves of the benefits which exist under Section 108. The Tax Court's argument that Section 108 is not applicable to a case such as the one before this Court because it found that the savings and loan association had no need for relief, is therefore antiquated. The Court further considers that the forfeiture amount does not really constitute "relief"; income which

16. Revenue Act of 1942, P.L. 77–753.

falls under Section 108 is tax deferred and ultimately recouped and does not escape taxation. Centennial thus properly characterized its income from early withdrawal penalties as income from the discharge of indebtedness and is entitled to avail itself of Section 108.

### III. CONCLUSION

The Court holds that because the mortgage loans in the R–49 transaction were not materially different in kind or extent, thus leaving Centennial in the same economic position before and after the exchange, Centennial is not entitled to claim a tax loss from the R–49 transaction.

The Court also holds that in 1981 Centennial was entitled to treat its income from the premature withdrawal penalty on its certificates of deposit as income from the discharge of indebtedness.

The government will promptly submit a judgment prepared in accordance with this Opinion.

SO ORDERED.