CENTENNIAL SAVINGS BANK FSB,
Plaintiff–Appellant, Cross–Appellee,

v.

UNITED STATES of America,
Defendant–Appellee,
Cross–Appellant.

No. 88–1297.

United States Court of Appeals,
Fifth Circuit.

Nov. 2, 1989.

Edward S. Koppman and Kathleen J. St. John, Akin, Gump, Strauss, Hauer & Feld, Dallas, Tex., for plaintiff-appellant cross-appellee.

Richard L. Bacon, Sp. Tax Counsel, U.S. League of Sav. Institutions, Washington, D.C. and Thomas A. Pfeiler, Gen. Counsel, Chicago, Ill., for amicus curiae, U.S. League of Sav. Institutions.

Bruce R. Ellisen, Asst. Atty. Gen., Gary R. Allen, Chief, Appellate Section, Tax

Div., Dept. of Justice, William S. Rose, Jr., and Richard Farber, Asst. Attys. Gen., Washington, D.C., for defendant-appellee cross-appellant.

Before BROWN, WILLIAMS and JOLLY, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Centennial Savings Bank appeals the district court's decision that the bank's exchange of 90% interests in depreciated mortgages with the Federal National Mortgage Association for a separate set of 90% interests in depreciated mortgages did not result in a loss for tax purposes. Centennial also challenges the district court's holding that the statute of limitations did not bar the IRS from assessing taxes owed. On a wholly separate issue the government cross appeals. It claims that the district court incorrectly ruled that income the bank had earned from penalties on the early withdrawal of certificates of deposit was to be treated for tax purposes as income from the discharge of indebtedness. We uphold the district court's rulings on the statute of limitations and the certificate of deposit issues. We overturn the district court's ruling that the mortgage exchange did not result in a realizable loss.

Centennial Savings Bank ("Centennial") is a savings and loan association regulated by the Federal Home Loan Bank Board (FHLBB).[1] On April 13, 1981, pursuant to the FHLBB's Memorandum R–49 Centennial engaged in a transaction in which it essentially exchanged a package of 90% participation interests in conventional and Federal Housing Administration and Veterans Administration (FHA/VA) mortgages. Centennial made this exchange with the Federal National Mortgage Association (FNMA). The participation interests exchanged were in conventional and FHA/VA mortgage packages having almost identical face and market value.

This transaction was styled "a reciprocal sale". Centennial received mortgage participation interests with a face value of $8,481,263.56. It paid $5,662,044.57 for these participation interests. Similarly, FNMA received participation interests with a face value of $8,481,261.47 from Centennial and paid Centennial $5,662,043.04 for these mortgages. *Centennial Savings Bank FSB v. United States*, 682 F.Supp. 1389, 1391 (N.D.Tex.1988).

■ Although this transaction is styled as a sale, the mortgages were carefully selected so as to meet the criteria of Memorandum R–49 and the monetary difference in the packages ostensibly sold was in fact approximately $2. We have already dealt with the issue of how to characterize a R–49 transaction and found that such a transaction, although characterized as a reciprocal sale, was in fact an exchange. *San Antonio Savings Association v. United States*, 887 F.2d 577 (5th Cir.1989) ("*SASA*"). We therefore consistently refer to Centennial's R–49 transaction with FNMA as an exchange.

This case comes to us consolidated with two other cases dealing with R–49 transactions, *SASA*, cited immediately above, and *First Federal Savings & Loan Assoc. of Temple v. United States*, 887 F.2d 593 (5th Cir.1989) ("*Temple*"). Because the details and history of the development of Memorandum R–49 by the FHLBB has already been dealt with in our opinion in *SASA*, we do not repeat that history here. The only significant difference between the facts of this case and those of *SASA* and *Temple* is that Centennial's transaction involved a straight swap of 90% participation interests in home mortgage loans, whereas *SASA* involved a triangular exchange of 90% participation interest, and *Temple* involved a straight swap of complete mortgages. These factual variations are of no consequence. The law as applied in *SASA* and *Temple* applies to these circumstances as well, and we so hold.

---

1. Centennial was previously known as First Federal Savings and Loan of Greenville. For pur-poses of consistency, however, we refer to the bank as Centennial throughout this opinion.

Centennial conducted its exchange on April 13, 1981. It then filed for a tax refund and claimed that it sustained a loss of $2,819,218.43. This amount was derived from the difference in the face value of the mortgages it held and the market value which it received from FNMA for the mortgages it received. Centennial filed for the tentative allowance of refund on February 4, 1982, and applied its loss through the carryback mechanism to the taxable years of 1969 through 1980 (1971 excluded). The IRS refunded the tax money Centennial claimed it was owed at that time from the loss and under the carryback. That amount was $788,633.67.

Also during 1981, Centennial received $258,019 as a result of premature withdrawals of certificates of deposit (CDs), a matter unrelated to the exchange of mortgage participation. Centennial characterized the income received from premature withdrawal of the CDs as income from discharge of indebtedness under § 61(a)(12) of the Internal Revenue Code. The government challenges that characterization, arguing that the money received for early withdrawal of the certificates of deposit constituted gross income.

On September 14, 1983, the IRS informed Centennial that the deduction resulting from the R–49 transaction would be disallowed and the CD penalties must be treated as ordinary income. On December 6, 1984, Centennial executed Form 872, entitled "Consent to Extend the Time to Assess Tax," which extended the time of assessment through December 31, 1985. On June 12, 1985, the IRS issued a notice of deficiency and on November 5, 1985, the IRS made its assessment that Centennial owed the full amount of the refund it had then received pursuant to the loss it claimed from the R–49 transaction.

## I. *The Statute of Limitations*

Before dealing with the merits of the lower court's characterization of the R–49 transaction and the CD penalties, we first examine Centennial's claim that the IRS assessment was unenforceable because the statute of limitations had run. Section 6501 of the Code [2] provides the general rule that the statute of limitations as applied to tax assessment is ordinarily three years. 26 U.S.C. § 6501(a) (1982). But, in an exception to the three year limit, the taxpayer can consent to later assessment.

> Where, before the expiration the time prescribed in this section for the assessment of any tax imposed by this title, except the estate tax provided in chapter 11, both the Secretary and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon.

26 U.S.C. § 6501(c)(4) (1982). The dispute in this case concerns the interrelationship between § 6501(c)(4) and § 6501(h), which deals with the period allowing for the assessment of carrybacks.

On December 6, 1984, Centennial's corporate officers signed Form 872, entitled "Consent to Extend the Time to Assess Tax." That agreement stated in part "[t]he amount of any Federal Income tax due on any return(s) made by or for the above taxpayer(s) for the period(s) ended December 31, 1981 may be assessed at any time on or before December 31, 1985."

The district court denied Centennial's motion for summary judgment which asserted that the federal government's assessment of taxes and interest were barred by limitations. *Centennial Savings Bank FSB v. United States*, 670 F.Supp. 195 (N.D.Tex. 1987) (order denying summary judgment). Centennial now appeals that ruling on two grounds.

First, Centennial contends that the form it signed constituted a "waiver" rather than an "extension" of the statute of limitations. Centennial cites two Supreme Court cases as support for this distinction, *Florsheim Bros. Drygoods Co. v. United*

---

**2.** Throughout this opinion, all sections referred to are within the Internal Revenue Code, 26 U.S.C. § 1 *et seq.* as in force during the applicable years, unless otherwise noted.

*States*, 280 U.S. 453, 50 S.Ct. 215, 74 L.Ed. 542 (1930), and *Stange v. United States*, 282 U.S. 270, 51 S.Ct. 145, 75 L.Ed. 335 (1931). In both of these cases the Court did conclude that the early analogies of Form 872 were waivers instead of contracts. The courts, however, drew no distinction between waivers and extensions.

■ Centennial contends that because Form 872 never contained the term "waiver" it constitutes an illegal "extension," which only Congress has the power to grant. This is too slender a semantic thread to support Centennial's argument, particularly since Form 872 parallels the language of § 6501(c)(4), which explicitly allows for assessment after the normal statutory period when both parties consent to it. This language is broad enough to incorporate either the concept of "extension" or "waiver".

■ Furthermore, this semantic hairsplitting seems at best to create a distinction without a difference. Even if one accepts Centennial's premise that only Congress can "extend" the statute of limitations, nevertheless waiving the ability to raise that defense in effect extends the period of limitations for however long a party contracts not to employ the defense. Whether such an agreement is characterized as a extension or a waiver, Congress has clearly provided for such agreements within the Tax Code. Hence it is not a usurpation of Congress' role for two parties to agree to allow assessment after the normal statute of limitations has run.

■ Centennial's second contention is that the assessment was barred by the statute of limitations because the assessment was for amounts attributable to the carryback years, 1960–1980 (excluding 1971), while the consent form concerned only tax due for 1981. This argument is in flat contradiction of the plain words of § 6501(h). Section 6501(h) makes the period of assessment for carryback years coterminous with the limitations period for the year giving rise to the loss.

In the case of a deficiency attributable to ... a net operating loss carryback or a capital loss carryback ... such deficiency may be assessed at any time before the expiration of the period within which a deficiency for the taxable year of the net operating loss or the net capital loss which results in such carryback may be assessed.

26 U.S.C. § 6501(h) (1982). Under this provision when a taxpayer agrees under § 6501(c)(4) that the tax for the loss year may be assessed beyond the normal three year period, he is automatically extending the limitations period for the assessment of that loss as applied to the carryback years.

The taxpayer's only authority for its construction of the code, *Badaracco v. Commissioner*, 464 U.S. 386, 104 S.Ct. 756, 78 L.Ed.2d 549 (1984), does not assist it. *Badaracco* held only generally that the statutes of limitation barring the assessment of taxes are to be narrowly construed to favor the government. *Id.* at 391, 104 S.Ct. at 761. *See also Lucia v. United States*, 474 F.2d 565, 570 (5th Cir.1973). But, the courts addressing this specific issue have held that an agreement to extend the period of assessment for the year in which the loss was incurred also extends the period for assessment for the carryback years. *Nalley v. Ross*, 308 F.Supp. 1388, 1393 (N.D.Ga.1969); *In re Crist*, 85 B.R. 807, 815 (Bankr.N.D.Iowa 1988). *See also, Pesch v. Commissioner*, 78 T.C. 100, 134, n. 57 (1982).

We conclude that the statute of limitations had not yet run when the IRS assessed the tax consequences of the loss claimed on the R–49 transaction for the tax year of 1981. Nor was the statute of limitations applicable to the carryback to the tax years 1969–1980 (excluding 1971).

## II. *The R–49 Transaction*

The district court below held that before a loss can be realized on an exchange of items, those items must be materially different. *Centennial*, 682 F.Supp. at 1396–98. The lower court concluded, however, that the mortgages exchanged were not materially different. It came to this conclusion by determining that the mortgages were economic substitutes for each other.

*Centennial,* 682 F.Supp. at 1398–1400. We hold today in the related case that a "material difference" is required between exchanged items before a realization event can be held to occur. We also hold, however, that "economic substitutes" can still be "materially different" from each other for tax purposes. *See SASA,* 887 F.2d at 590. As we stressed in the *SASA* decision, the FHLBB was not deciding the tax implications of its regulatory action. By the same reasoning, the IRS was not empowered to rule on the validity of the FHLBB accounting regulations as automatically implicating specific tax consequences. The test under the FHLBB's R–49 is "substantial identity" of the exchanged property. It is a different concept for a different administrative purpose from the IRS's concept of "material difference" for tax purposes. Tax Court so held, and we affirmed. *SASA,* 887 F.2d at 591.

■ We do not need to go into substantial detail as to the differences in the mortgage packages exchanged. It is sufficient to point out that the mortgages Centennial exchanged were generally for less expensive homes located in urban areas in north Texas. The mortgages received were for more expensive properties located throughout the state and primarily in non-urban areas. The average net worth of the mortgagors in the mortgages received was 40% higher than in the mortgages traded off. Also, the later performance of the two mortgage packages differed substantially.

In accordance with our decision of this day in *SASA,* we hold Centennial's R–49 transaction resulted in a realized and recognizable loss for tax purposes because the participation interests exchanged were in mortgages which under the Internal Revenue Code differed materially from each other.

III. *The CD Penalties Received by Centennial were Income from Discharge of Indebtedness Under § 108 of the Code*

The final issue in this case is whether the $258,019 received by Centennial during 1981 for early withdrawals of certificates of deposit (CDs) constituted "income from the discharge of indebtedness" under § 108 and § 1017 of the Code. The district court held that the "penalties" for early withdrawal were indebtedness discharge income. *Centennial,* 682 F.Supp. at 1400–03. The United States Tax Court and the Seventh Circuit have also addressed this issue and held to the contrary in *Colonial Savings Assoc. v. Commissioner,* 85 T.C. 855 (1985), *aff'd* 854 F.2d 1001 (7th Cir. 1988), *cert. denied,* — U.S. —, 109 S.Ct. 1556, 103 L.Ed.2d 859 (1989). On this issue, we respectfully disagree with the conclusions of the Tax Court and the Seventh Circuit in *Colonial Savings* and affirm the holding of the district court below.

There is no dispute that Centennial received income for purposes of the Internal Revenue Code when it received the early withdrawal penalties from its CD holders. The issue, however, is whether this income, the "penalty" money received for early withdrawal of the CDs, should be characterized as "income from the discharge of indebtedness." Such a characterization of the income would be favorable to Centennial because a taxpayer is permitted to pay the tax on income from the discharge of indebtedness over time via favorable mechanisms rather than immediately. 26 U.S.C. § 1017 (1982 and Supp. IV 1986).

The statutory scheme that gave rise to this question is fairly straightforward. As in force for tax year 1981, § 108 provided that "[g]ross income does not include any amount which (but for this subsection) would be includible in gross income by reason of the discharge (in whole or in part) of indebtedness of the taxpayer if ... (C) the indebtedness discharged is qualified business indebtedness." 26 U.S.C. § 108(a)(1)(C) (1982). "Qualified business indebtedness" was defined as follows:

Indebtedness of the taxpayer shall be treated as qualified business indebtedness if (and only if)—

(A) the indebtedness was incurred or assumed—

(i) by a corporation, or

(ii) by an individual in connection with property used in his trade or business, and

(B) such taxpayer makes an election under this paragraph with respect to such indebtedness.

26 U.S.C. § 108(d)(4) (1982). Section 108(c) then allowed a corporation to reduce the adjusted basis of his depreciable assets under § 1017 by the amount of the qualified business indebtedness.[3]

The principle that a taxpayer can realize income from the discharge of indebtedness was first established in *United States v. Kirby Lumber Co.*, 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131 (1931). In *Kirby Lumber*, a corporation retired some of its own bonds by purchasing them at a price less than the face value it had received for them when issued. The Supreme Court found that the excess of the issuing price over the purchase price constituted an accession to income. The Court characterized the income as income from the discharge of indebtedness.

According to Centennial, when the depositor purchased a CD at a bank, the bank incurred a debt toward that depositor. Under the terms of the CD, Centennial was obligated to repay the depositor's principal plus interest that had accrued at a fixed rate at an agreed future date. If the depositor withdrew his or her money before the end of the term, he or she was assessed a "penalty" for the early receipt of that money.[4] That penalty was predetermined by federal law. 12 C.F.R. § 1204.103 (1981); 12 C.F.R. § 526.7 (1980). Because Centennial characterized its relationship with holders of CDs as one of indebtedness, it treated the penalties assessed on the early withdrawal of CDs as "income from the discharge of indebtedness." The IRS argues instead that the penalty assessed for early withdrawal of a CD does not constitute income from the discharge of indebtedness, but is analogous to damages for breach of contract.[5]

 The general rule is that the characterization of income as income from the discharge of indebtedness depends purely on the spread between the amount received by the debtor and the amount paid by him to satisfy his obligation. 1 Bittker and Lokken, *Federal Taxation of Income, Estates and Gifts*, ¶ 6.4.2 (2nd Ed.1989). *See also* Bittker and Thompson, *Income from the Discharge of Indebtedness: The Progeny of United States v. Kirby Lumber Co.*, 66 Calif.L.Rev. 1159, 1166 (1978).[6] Under this general rule Centennial's CD penalties were income from the discharge of indebtedness.

3. All three of these provisions of § 108 were the result of a 1980 Act which completely overhauled § 108. Bankruptcy Tax Act of 1980, Pub.L. 96–589, § 2(a), 94 Stat. 3389, 3389–94. These provisions were incorporated without change into the 1982 version of the official code. Hence, although the relevant tax year is 1981, we cite here to the 1982 code.

Furthermore, all three of these provisions have now been struck from the Code. Tax Reform Act of 1986, Pub.L. 99–514, § 822(a), (b)(2), (b)(3)(A), 100 Stat. 2085, 2373. Because we are dealing with the law applicable to taxation of income in 1981, however, the subsequent amendment is irrelevant to this case.

4. The actual mechanics of such transactions do not result in the payment of a "penalty" by the CD holders. Centennial paid back the CD holders the principal and interest accrued to that point, minus the amount forfeited due to early withdrawal. Hence, technically no CD holders ever *paid* a "penalty" to Centennial—they merely received less money than they would have received if the accrued interest had been paid and the penalty had not been assessed.

5. Much has been made by the parties of the semantics of characterizing the difference between the principal and amount of interest accrued (the amount owed) and the amount actually paid. Centennial argues that this amount is a "forfeiture" while the IRS calls it a "penalty." We attach little import to the use of these different terms. While throughout this opinion we refer to the difference in the amount paid and the amount representing the principal and interest accrued as the "penalty," we do so only for conciseness. It is easier to say "the penalty" than to have to refer continually to "the difference between the amount representing accrued interest and original deposited principal and the amount actually paid." We do not by use of the term imply that the IRS is correct in characterizing the "penalty" as not constituting part of a discharge of debt transaction.

6. Bittker notes a number of exceptions to this general rule involving the nature of the debt. Bittker and Lokken, ¶ 6.4.2. None of these, however, are applicable to the case before us.

The general rule's focus on the final result has the aura of authenticity. As the Seventh Circuit conceded, one of the strengths of the savings institutions' argument is that "[a]fter all, whether the penalty is paid out of the funds in the bank's custody or by the depositor's funds from other sources, the effect of the penalty is to ensure that Colonial's net obligation to its depositor is far less than it would otherwise have been." *Colonial Savings*, 854 F.2d at 1006.

Bittker's application of *Kirby Lumber* involves financial adjustment purely for gain or to minimize loss.

> The classic case for the application of the *Kirby Lumber* principle is a financial adjustment in which a creditor accepts less than the full amount of the debt in full payment, either because of doubts about the debtor's ability to pay in full or because a rise in the interest rate for comparable loans has made the old debt worth less than its face amount.

Bittker and Thompson, 66 Calif.L.Rev. at 1174. In the case before us, the individual CD holders may have withdrawn their deposits for a number of reasons, including the possibility that the going market interest rate may have risen and made it more profitable to withdraw the CD funds and deposit them elsewhere. This scenario perfectly fits the classic characterization of debt discharge income. It is true that some CD owners may have withdrawn their deposits early for unanticipated personal reasons rather than the purely economic motives posited in Bittker's scenario. Regardless of their motivation, however, the end result was the same; the CD holders withdrew the money because they believed they could put it to better use elsewhere. In turn, Centennial discharged its debt for less than its accrued obligation.

A. *Prior History and Purpose of § 108*

█ The government in arguing that the CD penalties do not qualify as § 108 debt discharge income urges several grounds that were relied upon by the Tax Court and Seventh Circuit in *Colonial Savings*, 85 T.C. 855, *aff'd* 854 F.2d 1001. The first of these arguments is that § 108 was not intended to apply to debt discharge income of solvent, financially liquid companies. While § 108 was certainly originally intended to help financially troubled taxpayers, at the time applicable to this case it was not limited to such taxpayers. Hence we conclude that *Centennial* is not barred from the benefits of § 108 and § 1017, even if it was not financially troubled.

Often indebtedness is discharged to a company having financial difficulties. The creditor's purpose in discounting such a company's debt is to trade the right to full payment for swifter and more certain payment of a lesser portion of the debt. This sort of debt discharge produces income in the debtor's books due to a lowering of liabilities, but it does not leave the debtor with more cash in hand with which to pay taxes. It was because of these concerns that Congress originally enacted the predecessor to § 108, § 22(b)(9) of the Internal Revenue Code of 1939. Revenue Act of 1939, ch. 247, § 215(a), 53 Stat. 863, 875. Thus, Section 22(b)(9) provided that a corporation could exclude the amount of a discharge of indebtedness from its gross income if the corporation was in an "unsound financial condition".

But, in 1942, Congress removed the requirement that the corporation be in an "unsound financial condition". Revenue Act of 1942, ch. 619, § 114(a), 56 Stat. 798, 811. It is not entirely clear why the requirement was removed, but there is no question but that the amendment constituted a significant broadening of the provision. The Senate Committee which proposed its removal merely stated that its amendment relaxed "the standard established in 1939 and makes it possible for *all* corporations to have the advantages granted by this section without an impairment of their credit." (emphasis added) S.REP No. 1631, 77th Cong., 2nd Sess. § 114 (1942), 1942–2 C.B. 504, 564.

Finally, in 1986, Congress came full circle and eliminated the "qualified business indebtedness" provision from § 108, so that now only discharge of indebtedness income occurring in a bankruptcy case or when the

taxpayer is insolvent is excluded from gross income by § 108 and qualifies for the "spreading" provision of § 1017. Tax Reform Act of 1986, Pub.L. 99–514, § 822(a), 100 Stat. 2085, 2373 (codified as amended at 26 U.S.C. § 108(a) (Supp. IV. 1986)). Whatever may have been Congress' initial purpose in exempting debt discharge income from an immediate taxation, however, there was no requirement of financial inability to pay tax on that income between the years of 1942 and 1986, the critical year in this case being 1981.

The Tax Court in *Colonial Savings* noted the elimination of the requirement of unsound financial condition but then failed to credit it, claiming that § 108 and its predecessors were only intended to apply to situations in which assets were "trapped" and not liquid. *Colonial Savings*, 85 T.C. at 863–64. The tax court relied on *Estate of Delman v. Commissioner*, 73 T.C. 15 (1979) in drawing its conclusion. *Delman* does not, however, deal with an instance of income from discharge of indebtedness, nor does it interpret § 108 (in it's pre–1986 form) to require insolvency. *Delman*, 73 T.C. at 39–40, n. 19. The district court in the instant case correctly rejected this Tax Court analysis in *Colonial Savings* because the Tax Court failed to take into account Congress' removal of the unsound financial condition requirement. *Centennial*, 682 F.Supp. at 1402.

**B.** *Spurious versus Genuine Discharge of Indebtedness*

The government next argues that the debt discharge is not "genuine" § 108 debt discharge but represents a "spurious" debt discharge. This phrase was employed by Professor Bittker in the often quoted, previously cited, article. *See* Bittker and Thompson, 66 Calif.L.Rev. at 1174. Two broad characteristics of spurious cancellation of indebtedness outlined by Professor Bittker are (1) the debt is not discharged for less than its full amount, but is paid in full indirectly and (2) the debt is cancelled "not to effect a financial adjustment of the debtor-creditor relationship but as an indirect way of achieving a much different objective." 1 Bittker and Lokken, *Federal Taxation of Income, Estates and Gifts*, ¶ 6.4.4 (2nd Ed.1989).

A widely used example of a spurious cancellation of debt occurs when an employer "loans" an employee $50 with the understanding that it will be deducted from the employee's next paycheck. The next pay day no cash changes hands, the transaction is formally termed a "cancellation" but nevertheless the debt is paid in full. The employee must report the $50 as regular income, not as income from the discharge of indebtedness within the meaning of § 108 or *Kirby Lumber*. Bittker and Thompson, 66 Calif.L.Rev. at 1174. In this situation the employee did not gain nor did the employer lose income through the discharge of debt. The employer received work equal in value to the money which it paid; the employee conversely earned his wage. The only difference between this arrangement and the ordinary circumstance is that the employee received his payment ahead of time with the understanding that he would not receive that portion of his wage on pay day. Cancellation of indebtedness occurred in this example, but neither party received income as a result of the transaction.

It is important to note what was and was not spurious in the example above. The debt discharge itself was not spurious, because the debt was truly and effectively cancelled. What would be spurious would be "the implication that the debt was discharged for less than its face amount." Bittker and Lokken, ¶ 6.4.1, n. 23.

The spurious versus genuine debt discharge distinction is upheld by cases which deal with § 108 and its statutory predecessors. Genuine discharge of indebtedness is held to have occurred in cases where creditors accepted less than full value for the amounts which were owed in return for the benefit of early payment. Such a case of genuine debt discharge is *Reliable Incubator and Brooder Co. v. Commissioner*, 6 T.C. 919, 926–27 (1946). In that case, the taxpayer-debtor had a debt of $6,700 upon which he was obligated to make $50 monthly payments. His creditor needed funds, so

the parties agreed to reduce the outstanding debt by $1,200 in exchange for an advance payment of $600. The Tax Court determined that the taxpayer-debtor received $600 discharge of indebtedness income.[7] *See also San Marcos Hotel Co. v. Commissioner,* 11 T.C.M. 388, 392–93 (1952), *aff'd,* 205 F.2d 641 (9th Cir.1953).

In cases of spurious debt discharge, the debt discharge is often described as merely the "medium of payment" for an obviously separate obligation between two parties. *Colonial Savings,* 854 F.2d at 1005. Two clarifying examples of use of debt discharge as a mere medium of payment are *Spartan Petroleum Co. v. United States,* 437 F.Supp. 733 (D.S.C.1977) and *OKC Corp. v. Commissioner,* 82 T.C. 638 (1984). Spartan Petroleum Company was a gasoline distributor that was $233,174.73 in debt to its franchiser, Atlantic Richfield Company (ARCO). ARCO sought to cancel its franchise agreement with Spartan. The two parties agreed that ARCO would pay over $1 million in damages for that cancellation. ARCO agreed, however, to subtract Spartan's debt from its damages payment, rather than pay the full amount and then require Spartan to repay separately its debt to ARCO. Spartan characterized this cancellation as giving rise to § 108 debt discharge income. The district court concluded, however, that the cancellation of indebtedness was not a § 108 discharge because the "forgiveness of the indebtedness" was in fact part of the payment to the distributor for cancellation of the franchise agreements. Similarly, in *OKC* Phillips Petroleum agreed to cancel a debt of OKC's in return for OKC's agreement to release Phillips from an unprofitable output contract.

In each of these cases, the creditor did not discharge the debtor of part or all of his obligation. The creditor had his loan entirely repaid by the receipt of something valuable from the debtor, and the cancellation of the debt was merely the creditor's method of payment. In contrast, in *Reli-*

*able Incubator* the creditor discharged a portion of the debt for the direct purpose of receiving payment of the remaining debt more quickly. Thus, two factors distinguish *Reliable Incubator* from *Spartan.* (1) The thing received—faster payment of outstanding debt—was only in the context of the debtor/creditor relationship. In both *Spartan Petroleum* and *OKC Corporation* on the other hand, the debt was cancelled as payment for an entirely different item or right of material worth outside the debtor/creditor relationship. (2) In *Reliable Incubator,* after all the dust had settled, the creditor did not get the full value of the loan back, whereas in *OKC* and *Spartan* they did.

■ Thus, only genuine or "pure" debt discharge income falls within the ambit of § 108. We must now examine, therefore, whether Centennial's CD penalties are more like the income received in *Reliable Incubator* or that which occurred in *Spartan.*

### 1. The CD Penalty as Payment of a Separate Obligation

The Tax Court endorsed the IRS's view that when a CD holder received less money back than he otherwise would because of the penalty for early withdrawal, that forfeiture did not result in § "108 debt discharge" income. The Tax Court views the penalty essentially as liquidated damages for breach of contract by early withdrawal of the deposits, rather than pure debt discharge. Hence the penalty was merely a medium for payment of a separate obligation. *See Colonial Savings,* 85 T.C. at 866–67.

> We hold that the forfeiture in this case is not a discharge of indebtedness within the meaning of the statutes and *United States v. Kirby Lumber Co., supra,* and its progeny. As more fully discussed in the foregoing opinion, we find that the forfeiture was a separate and distinct obligation required of depositors for early withdrawal and not a forgiveness or

---

**7.** The taxpayer was not, however, allowed to exclude the income as debt discharge from its gross income because the transaction occurred prior to 1942 at the time when the law required the taxpayer to be an "unsound financial condition."

discharge of the debt. The debt to the depositor was not cancelled or discharged, it was simply reduced.

*Colonial Savings*, 85 T.C. at 861.[8]

We cannot accept the government's claim that the CD penalty was a separate obligation, independent from the debtor/creditor relationship existing between the bank and the depositor. The penalty was not assessed as the result of a separate relationship. It was an integral part of the CD arrangement, a requirement delineated prior to the purchase of CD. No separate contract created the CD penalty, and in fact the penalty was an integral part of the CD obligation. The legal nature of a Certificate of Deposit is controlling. Part of a CD's function is to act as a hedge against a fall or an increase in interest rates. When the bank sells the creditor/depositor a CD, the bank is then obligated to pay the owner of the CD a fixed interest rate for a set period of time. If the market interest rate falls during that period of time, even precipitously, the bank must still continue to pay the CD holder that set interest rate. On the other hand, if the market interest rate rises significantly after the depositor has purchased his CD the bank will still need to pay no more than the fixed rate. In such circumstances the bank gets the use of the CD owner's money cheaply during a period of expensive money. If the CD owner could simply withdraw his money whenever the market interest rates rose above the agreed upon amount, there would be no point in having a CD arrangement (at least from the banker's point of view).

■ The early withdrawal penalties allow the CD owner to buy the early termination of his agreement to leave his money in for a given period of time at a set interest rate. Because the contract is purely one of debt and credit, the penalty provision creates pure debt discharge and it adds nothing to say it is liquidated damages for breach of contract.

■ The payment of Centennial's CD penalty is not an obligation independent of the creditor/debtor relationship, as were the damages in *Spartan*. What makes this case different from *Spartan* is the nature of the penalty. The penalty clause is actually nothing more than a common business arrangement which is the very basis of the CD as a financial device. The early withdrawal, pragmatically, is not a breach of contract. It is simply a right to end the contract at an earlier time by a discount of the face value at maturity.

The fact that this particular debt discharge is required by federal regulations does not change the ultimate result—if the creditor claims his money early he reduces the amount of the debtor's obligation. Further, the change in the code in 1986 that now makes the receipt of such penalties a part of gross income does not change the routine nature of the transaction. It only changes the tax consequences, as of course the government has full power to do.

### 2. The Two–Step v. One–Step Distinction

The government claims that the CD penalties are properly analyzed as a two-step transaction, albeit a hidden two-step transaction of the sort involved in *Spartan Petroleum*. According to the government if the depositor had paid the penalty in cash, and in turn received the entire amount due on the account, then the bank-taxpayer would have had income in the amount of the penalty. That income, however, would not have been income from the discharge

---

**8.** We fail to understand the distinction which the Tax Court makes between cancellation or discharge of debt on the one hand and "debt reduction" on the other hand. Debt reduction was the *means* by which both the creditor in *Reliable Incubator* and *Centennial* each discharged part of their creditor's debts.

If a bank loans an architect $25,000 and then accepts $10,000 worth of the architect's services as fully extinguishing the $25,000 debt, $15,000 of the debt was "discharged" and $10,000 of the debt was paid in full. Bittker and Lokken, ¶ 6.4.4. This transaction can be described equally well as a "debt reduction" or discharge of part of the debt and payment in full of the rest. Hence the issue is not whether "debt discharge" or "debt reduction" occurred, but rather whether the creditor genuinely received less than the full value of his loan in complete satisfaction of the debtor's debt.

of indebtedness because in the posited example there was no discharge of a debt for less than its face amount. The source of income was simply from the receipt of a penalty.

This "two transaction versus one transaction" analysis misapplies the law and elevates form over substance. In *Spartan* a debt was forgiven as a means of payment for breach of an entirely separate contract. The purpose of the debt forgiveness was to fulfill two different obligations in one action. The same effect would have been achieved if the debtor had paid the creditor the amount of money owed and then the creditor had paid the debtor for the breach of the separate dealership contract. Instead, the parties agreed that the two obligations cancelled each other. Such a transaction involving two completely separate relationships and obligations between the parties can properly be characterized as a two-step transaction hidden in a one-step transaction.

The critical question, however, is whether the debtor ultimately fully repays his debt, whatever the form of that repayment. Any pure debt discharge transaction could be characterized as taking two steps. A § 108 discharge of indebtedness would arise if a lender loaned $1,000 to a retail businessman but provided in the loan agreement that if the debtor encountered financial trouble (measured, for example, by a drop in sales of "x" units per month over a defined number of months) the required repayment on the debt would be reduced to $800. Under the government's analysis, such a loan agreement unrealistically would create a "separate obligation" on the creditor to pay $200 to the retail business if financial trouble occurred and the debtor would be conceived of as repaying his lender the full $1,000 after which the lender simply contributes $200 to assist the troubled business.

In accordance with our analysis, however, we focus upon the result. The result would be that the debtor paid $800 in complete discharge of his $1,000 debt. Thus, he received $200 in income through debt discharge. Hence, we conclude that this claim by the IRS fails to demonstrate that CD penalties are spurious debt discharges.

### 3. *Aberrations from Normal § 108 Debt Discharge Form*

The IRS next contends that the CD penalties exhibit aberrations from ordinary § 108 debt discharge patterns because normal § 108 debt discharge cases are the result of negotiation. It is true that debt discharge is often ad hoc, arising from the changed circumstances of the debtor rather than prearranged contractually. There is no reason, however, that debt discharge cannot be prearranged contractually.

Furthermore, the fact that the creditor rather than the debtor initiates the CD withdrawal is of no consequence. Both the courts and the Internal Revenue Service agree that an individual homeowner/debtor realizes income from partial discharge of his home mortgage debt if he agrees to prepay his loan at a discount to his lender. S & Ls and banks frequently offer their mortgagors this prepayment opportunity in order to permit the creditor S & L or bank to profit by reloaning the mortgage money at higher interest rates. *See Sutphin v. United States,* 14 Cl.Ct. 545 (1988); *Michaels v. Commissioner,* 87 T.C. 1412 (1986); Rev.Rul. 82–202, 1982–2 C.B. 36. In such cases the creditor initiates the transaction by offering the terms of debt reduction. But the government argues that this situation is distinguishable because the amount of debt forgiveness was the result of bargaining between the parties. We do not find this bargaining requirement persuasive. It is not in the Code, and in any event the penalty was bargained for as an integral part of the single transaction.

A related argument involves the Tax Court's method of distinguishing *Reliable Incubator.*

Petitioner here [Colonial Savings] was in debt for interest (and principal) and part or all of its indebtedness was "paid" or offset by the depositors' obligation for a penalty attributable to premature withdrawal. Stated another way, the debtor's accumulated interest was essentially

used to pay the penalty on a dollar-for-dollar or par basis. The parties in *Reliable Incubator* entered into a "two-for-one" reduction in indebtedness so that each dollar paid provided an additional "dollar of forgiveness" of the debt. Only the additional dollar or credit (the "forgiveness dollar") was found to be income from discharge of indebtedness. *Colonial Savings,* 85 T.C. at 868. We fail to perceive the difference in facts that the Tax Court does. In *Reliable Incubator,* the creditor wished to receive part of the debt more quickly and in exchange for this benefit agreed to reduce the debtor's obligation. Here the depositors wish to receive the money for their CD's back from the bank ahead of schedule and therefore agreed to a reduction in the amount *Centennial* owed them in exchange for that benefit. Whether this is characterized as essentially two-for-one or one-for-one does not matter. In both cases the creditor gave up his rights to a part of the debt in order to receive the rest of debt more quickly. We find no justification in the Code for a conclusion that the amount given up to the amount of debt paid off matters for tax purposes.

## C. *Revenue Ruling 73–511*

The Seventh Circuit in *Colonial Savings* affirmed the Tax Court, but emphasized different reasoning from the IRS in its decision. Rather than relying on the spurious versus genuine debt discharge distinction, the Seventh Circuit based its determination upon the conclusion which it drew from Revenue Ruling 73–511 that a withdrawal penalty is not a § 108 debt discharge. *Colonial Savings,* 854 F.2d at 1006–07. The ruling says:

> There is no statutory provision for the use of any type of netting rule since the interest paid or credited and the forfeiture incurred represent two separate transactions and are taxable as such. Interest paid to the depositor or credited to his account with no restriction as to withdrawal is includible in his gross income in accordance with his accounting method. This [sic] only relationship between the interest and the forfeiture penalty is the

> fact that the penalty is calculated by reference to a given amount of interest. . . .
>
> . . .
>
> Also, while the gross amount of interest paid or credited to the depositor must be included in the depositor's gross income, in the case of an individual depositor, the forfeiture, allowable as a loss under section 165(a) of the Code, would generally be considered as a loss incurred in a transaction entered into for profit, as described in section 165(c)(2), and may be claimed in the year of the forfeiture only if the taxpayer itemizes his deductions. However, if the deposit arrangement is entered into as part of the individual taxpayer's trade or business, the forfeiture would be a loss incurred in a trade or business, as described in section 165(c)(1), and would be deductible in the year of forfeiture in arriving at adjusted gross income. All other taxpayers would claim a loss under section 165(a) in the year of the forfeiture.

Rev.Rul. 73–511, 1973–2 C.B. 402.

We conclude that the Seventh Circuit read too much into Revenue Ruling 73–511. The crucial language, "the interest paid or credited and the forfeiture incurred represent two separate transactions" is somewhat ambiguous. Indebtedness always involves two types of transactions, the periodic payment or accrual of interest and the retirement of the indebtedness. While these are clearly two separate transactions, the Ruling does not explicitly state whether the payment of the aggregate of the principal and accrued interest at early retirement of a CD is a separate transaction from the forfeiture of a portion of such principal and accrued interest on early retirement.

Assuming that Revenue Ruling 73–511 is read to address the relationship between the payment of principal and accrued interest and the early withdrawal penalty at retirement of the CD, we still do not find the Revenue Ruling controlling because it addresses only the mechanics of forfeiture and accrual of interest rather than the underlying relationship. It says that the pen-

alty and interest payment are two separate transactions, but never says that two separate *obligations* are involved. As noted above, the forfeiture provision is integral to the CD arrangement. Revenue Ruling 73–511 does not characterize the payment of interest and principal on the one hand and the forfeiture of the early withdrawal penalty on the other hand as created by two separate agreements or obligations.

We assume that for accounting purposes the discharge of a debt at a reduced rate constitutes two transactions in order to assess the amount lost by the creditor and gained by the debtor on the debt discharge. In the case of the CD withdrawals at issue, only one transaction actually occurred but we agree that the mechanics of the transaction should not control here. The controlling conditions to establish the discounted "penalty" as income must be: (1) the debt discharge occurred purely in the context of the debtor/creditor relationship as opposed to advancing a separate relationship or goal, and (2) the debt was ultimately fully discharged. In the case of these CDs both of these conditions were met.

The Seventh Circuit concluded that early withdrawal penalties are "sufficiently different" from the usual § 108 debt discharges that "Congress can be expected to have addressed specifically any special tax consequences surrounding [their] use." *Colonial Savings*, 854 F.2d at 1007. Congress did address Revenue Ruling 73–511. The Ruling only allowed deduction of early withdrawal penalties from gross income by those who itemized their deductions. Congress sought to soften the blow of the Revenue Ruling by allowing non-itemizers to deduct early withdrawal penalties from gross income. Pub.L. No. 93–483, § 6(a), 88 Stat. 1457, 1458–59 (1974). This congressional response is currently codified at 26 U.S.C. § 62(a)(9).

> (a) General Rule—For purposes of this subtitle, the term "adjusted gross income" means, in the case of an individual, gross income minus the following deductions: ....
>
> (9) Penalties forfeited because of premature withdrawal of funds from time sav-

ings accounts or deposits—The deductions allowed by section 165 for losses incurred in any transaction entered into for profit, though not connected with a trade or business to the extent that such losses include amounts forfeited to a bank, mutual savings bank, savings and loan association, building and loan association, corporative bank or homestead association as a penalty for premature withdrawal of funds from a time savings account, certificate of deposit, or a similar class of deposit.

26 U.S.C. § 62(a)(9) (Supp. IV 1986). If the interest was included in gross income, the early withdrawal penalty was then subtracted from gross income, and the end result was just as if the netting rule was in force. This provision negates the IRS's determination that there was no "netting rule" allowing only the interest credited under a CD minus the early withdrawal penalty to be included in gross income.

Congress never, however, directly addressed the issue of whether early withdrawal penalties were to be considered income from debt discharge or not. The Seventh Circuit held that

> [N]othing in this legislation or in its legislative history expresses disapproval of the revenue rulings' conclusion that interest income and early withdrawal penalties are separate and distinct obligations, and that interest income and penalties cannot be set off for income tax purposes.

*Colonial Savings*, 854 F.2d at 1007. We do not find the Congressional reaction to Revenue Ruling 73–511 dispositive, as does the Seventh Circuit. The failure to discuss whether early withdrawal penalties equal § 108 debt discharge income is not unreasonable, given the fact that Revenue Ruling 73–511 itself never directly addresses the issue. We therefore do not interpret Congressional silence on this issue as endorsing the IRS's current treatment of early withdrawal penalties as not being income from debt discharge under § 108.

The issue of what constitutes debt discharge for purposes of § 108 is admittedly difficult and many of the questions raise

evenly balance considerations.[9] We recognize that we are taking a position in opposition to the Internal Revenue Service, the Tax Court, and the Seventh Circuit. We nevertheless conclude that income from early withdrawal penalties of CDs can properly be classified as income from the discharge of indebtedness under the doctrine of *Kirby Lumber* and for purposes of § 108. We conclude that the so-called "penalty" for early withdrawal under the code as it then existed created income to the bank-debtor in the nature of a discharge of indebtedness. The fact that Congress has now decided to change the statute to treat the income as part of gross income does not change the dictates of the code as it existed and was applicable to the transactions here involved.

### Conclusion

We uphold the district court's determination that the IRS's assessment was not barred by the statute of limitations and that the money Centennial received from early withdrawal penalties from certificate of deposits was income by way of debt discharge under § 108. We also uphold the district court's determination that a material difference is required between two exchanged items before gain or loss can be realized, but in accordance with the companion cases decided this day, we reverse the district court and find that the mortgage participation interests exchanged and received by Centennial were materially different under the Internal Revenue Code. AFFIRMED IN PART; REVERSED AND RENDERED IN PART.

**9.** Discharge of indebtedness cases and the technical distinctions in this area have been described as "[o]ne of the murkiest pools of obscurity in the tax law for the past three decades...." *See* Eustice, *Cancellation of Indebtedness and the Federal Income Taxes: The problem of creeping confusion,* 14 Tax.L.Rev. 225 (1959).